83 Cal.App.3d 593 (1978)
148 Cal. Rptr. 57
CONTINENTAL INSURANCE COMPANY, Plaintiff, Cross-defendant and Appellant,
v.
MORGAN, OLMSTEAD, KENNEDY & GARDNER, INC., Defendant, Cross-complainant and Respondent; INSURANCE COMPANY OF NORTH AMERICA et al., Cross-defendants and Appellants.
Docket Nos. 50536, 50735.
Court of Appeals of California, Second District, Division One.
August 7, 1978.
*596 COUNSEL
Donald D. Black for Plaintiff, Cross-defendant and Appellant.
Anderson, McPharlin & Connors, David T. DiBiase, Jones & Wilson and Robert E. Jones for Cross-defendants and Appellants.
Booth, Mitchel, Strange & Smith, George C. Mitchel, Michael T. Lowe and Joseph M. Rimac for Defendant, Cross-complainant and Respondent.
*597 OPINION
THOMPSON, J.
Continental Insurance Company (Continental), as subrogee of Manufacturers Hanover Trust Company (Manufacturers), sued Morgan, Olmstead, Kennedy & Gardner, Inc. (Morgan), a broker which had acted as principal or agent in purchasing United States treasury bills which had been stolen from Manufacturers. The complaint asserts several theories of liability. It claims that Morgan failed to use due diligence to learn the essential facts concerning its customer's acquisition of the bills, that Morgan violated rule 405 of the New York Stock Exchange and article III of the Manual of the National Association of Securities Dealers, Inc., both of which impose a duty to exercise due diligence to ascertain essential facts relative to customers of brokerage houses, that Morgan converted the treasury bills, common counts, and the right to implied indemnity.
At the time of Morgan's purchase of the stolen treasury bills, Morgan was insured by Aetna Insurance Company (Aetna) by a brokers blanket bond indemnifying Morgan against loss or liability imposed by the insured's good faith dealing for its own account or for others with securities that proved to have been stolen. The Aetna policy also indemnifies against related attorneys' fees and court costs. It is limited in its coverage to losses discovered after the effective date of the policy but prior to its cancellation. While the policy was in effect, Morgan notified Aetna of the fact that stolen securities had been negotiated through Morgan. After the notice, Aetna terminated its coverage and a brokers blanket bond in essentially identical terms was issued to Morgan by Insurance Company of North America (INA). The INA bond also covers losses sustained by the insured at any time but discovered after the effective date of the policy.
Morgan sought defense of and indemnity from the consequences of the Continental lawsuit from both Aetna and INA. Both denied coverage and refused the defense. Morgan answered Continental's complaint denying its charging allegations and asserting affirmative defenses.
The trial court found that Morgan was not at fault, that Manufacturers was, and that, in any event, by reason of its failure to establish a superior equity Continental was not entitled to relief except to the extent that a small portion of the loss had been prevented by action stopping payment on Morgan checks after the fraud was discovered. The court determined, also, that the Aetna but not the INA policy indemnified Morgan for its attorneys' fees and cost incurred in defending the action.
*598 Both Continental and Aetna have appealed from the trial court's judgment. INA has filed a protective appeal.
Continental contends that the trial court prejudicially erred in applying the doctrine of superior equities, in barring for lack of a foundation expert testimony offered by Continental to establish the standard of care of brokerage houses in dealing with treasury bills, in making inconsistent findings of fact, in failing to make findings on material issues, in failing to find that Morgan did not act in good faith, in determining that Morgan was not under a duty to inquire concerning the ownership of the treasury bills, and in failing to make a finding on whether a Morgan officer was a participant in the scheme to negotiate the stolen bills.
Aetna contends that its policy does not indemnify Morgan both because the loss is not one covered by the policy and because the loss was not discovered until after the policy terminated. It argues also that its coverage is not primary. INA resists Aetna's claims that the loss was not discovered until after termination of the Aetna policy and that Aetna did not provide the primary coverage. As a protective measure, INA adopts Aetna's position that the loss is not covered.
We conclude: (1) the record supports the trial court's determination that Continental, as a surety-subrogee, has not established an equity superior to that of Morgan and hence that Continental's other contentions also fail; (2) both the Aetna and INA policies cover the loss; and (3) because both the Aetna and INA policies contain clauses providing that they are to be treated as excess insurance policies where other insurance exists, the liability to Morgan for attorneys' fees and costs must be prorated between the two insurers.
Accordingly, we affirm those portions of the judgment which deny Continental's claim against Morgan and which grant Morgan's claim against its insurers for attorneys' fees and costs. We reverse that portion of the judgment which provides that only Aetna is obligated to indemnify Morgan for those items and remand the matter to the trial court for determination of the allocation. We also remand the matter for determination of further sums payable by the insurers for Morgan's legal fees and costs in defending against Continental's appeal.

*599 Facts re Stolen Treasury Bills

Manufacturers is a New York bank. In 1970, it acted as custodian of negotiable bearer treasury bills owned by Merrill Lynch, Pierce, Fenner & Smith. The certificates representing the treasury bills were physically handled at what was known as the "Merrill Lynch" desk in the "dealers clearance section" at Manufacturers. In July of 1970, the security arrangements of the "dealers clearance section" broke down. Millions of dollars in bearer treasury bills owned by Merrill Lynch were left unattended upon a desk top in the Merrill Lynch section. Sign-in procedures were not followed. Employees of Manufacturers and purported workmen coming on the premises had access to the treasury bills on the unattended desk top at times when other employees in the section were socializing.
On July 28, 1970, bearer treasury bills in the total amount of $3,150,000 disappeared from the Merrill Lynch desk. On that date, treasury bills piled on the desk top were unattended for 45 minutes. Two purported Western Union repairmen were in the vicinity of the desk on July 28. A Manufacturers' employee of 13 years did not report to her work station at the Merrill Lynch desk on July 29 and never again reported for work.
Supervisory personnel of Manufacturers originally believed that because of some operational error the treasury bills merely appeared to be missing. As a precautionary measure, however, Continental, Manufacturers' insurer, was informed of the missing bills on July 28. On July 30, Manufacturers undertook an effort to determine the serial numbers of the missing bills by checking in house records and calling other banks and brokerage houses. The task was a difficult one because of the Federal Reserve's policy with respect to handling treasury bills. On July 30, Manufacturers asked the Federal Reserve to assemble a list of identification numbers of stolen treasury bills. On August 7, Manufacturers received a Federal Reserve prepared list in response to its request. On that date, Manufacturers circulated an internal bulletin that treasury bills had been stolen and notified Stock Clearing Corporation of that fact. Stock Clearing Corporation transmitted a "flier" to its members conveying the information. The circulation of the "flier" was a limited one.
On August 10, 1970, Manufacturers telephoned a notice to R.L. Polk and Company, a national bank directory publisher which included the *600 serial numbers of the missing treasury bills in a widely circulated "Important Notice to Bankers and Brokers Lost or Stolen Securities."
On July 21, 1970, Cono Nicholas Marino, using the name Harry Samuel, telephoned Davis Pillsbury, a registered representative of Morgan, and stated that he wished to liquidate United States treasury bills. Pillsbury called Marino back and told Marino that it was Morgan's policy to require that the bills be in hand before Morgan would sell them. Pillsbury also informed Marino that there would be a two- or three-day delay in payment. Shortly afterward, Marino brought five $10,000 bearer treasury bills and one $10,000 bearer FNMA certificate to Morgan for sale. Having first had the securities checked against a list of stolen government securities and found them to be legitimate, Morgan, on July 21, purchased the FNMA certificate as principal and sold the five treasury bills as agent for Marino. The cashier's department at Morgan was instructed to check all future transactions in treasury bills against a "stolen securities list."
Rule 405 of the New York Stock Exchange provided that it was the duty of every member organization to "[u]se due diligence to learn the essential facts relative to every customer ... [and]... every order...." Pillsbury prepared a "customers information card" for Marino dated July 21. The next day, Morgan paid the proceeds of the July 21 sale to Marino by certified check payable to the fictitious "Harry Samuel." Marino requested that payments for future sales be made in certified checks of $10,000 denomination with his signature indorsing the checks guaranteed by Morgan because Marino intended to use the checks to bid at real estate auctions. Neither the use of certified checks in payment nor the guarantee of indorsement is unusual. Morgan knew of the practice of using checks with indorsement guarantee as a means of bidding at real estate auctions.
Morgan mailed confirmation of the July 21 sale to the address of an insurance firm with which Marino said he was connected. The confirmation was returned, apparently with the notation that the addressee was unknown at the address. Pillsbury telephoned Marino at the telephone number given by the latter and was told by Marino that he had recently "bought into" the insurance agency so that he was unknown to some of the clerical employees.
*601 Marino had given Valley National Bank as his banking institution when first interviewed by Pillsbury. After the July 21 transaction, Pillsbury received a telephone call from that bank in which he was informed that Marino was seeking a loan.
On July 31, 1970, Marino presented $200,000 in bearer treasury bills to Morgan requesting that they be sold. The cashier's department of Morgan did not report any defect in the bills and they were purchased by Morgan and immediately resold to Bank of America which paid for them. Morgan structured the settlement date on the transaction so that it would receive payment for the bills before it became obligated to pay Marino for them. On August 4, 1970, Morgan paid Marino $195,927.78, representing the amount realized by him on the sale. Payment was in the form of certified checks payable to Harry Samuel. The indorsement of Marino using the name "Samuel" on the checks was guaranteed by Morgan.
On August 6, 1970, Marino sold $100,000 in treasury bills through Morgan. Morgan purchased those bonds as principal and immediately resold them. On August 10, Morgan paid Marino $97,627.78. Again payment was in certified checks payable to "Samuel" with Marino's signature in that name indorsing the checks guaranteed by Morgan.
On August 19, Marino presented $200,000 in treasury bills for sale. Morgan purchased them as principal and immediately resold the bills. On August 20, Morgan's insurance agent called James McPhail, an officer of Morgan, and asked if Morgan had "handled" any stolen "treasuries." On August 24, Morgan issued checks totaling $197,777.75 to Marino (Samuel) generally in $10,000 denominations with the signature indorsing the checks guaranteed.
On August 27, agents of the Federal Bureau of Investigation called Morgan and informed it that $500,000 in stolen treasury bills had been negotiated through that firm.
On August 28, 1970, Morgan received R.L. Polk's notice of stolen securities issued by Polk in response to Manufacturers' communication. On those dates, Morgan was first placed on notice that the treasury bills negotiated by Marino on July 31, August 6, and August 19 had been stolen from Manufacturers. Morgan was able to stop payment on $30,000 *602 of the checks issued in the August 19 transaction. The remainder of the checks cleared.
Pursuant to its blanket bond, Continental paid Manufacturers for the loss suffered by Manufacturers on the stolen securities. On July 27, 1972, Continental, as subrogee of Manufacturers, commenced the case at bench by filing its complaint against Morgan to recover that portion of the loss represented by the $500,000 in stolen treasury bills negotiated through Morgan.

Doctrine of Superior Equities
(1) In Meyers v. Bank of America etc. Assn. (1938) 11 Cal.2d 92 [77 P.2d 1084], our Supreme Court, following the rule in the majority of jurisdictions (see Annot. (1942) 137 A.L.R. 700), adopted the principle that where a wrongdoer causes loss both to a surety by reason of its bond and to a third person, the surety's normal right of recovery through subrogation against the third person is limited to situations in which the surety's equity is superior to that of the third person (Meyers, supra, at pp. 98, 102-103). The burden is upon the surety to establish its superior equity. (American etc. Ins. Co. v. Capital Nat. Bk. (1946) 75 Cal. App.2d 787, 793 [171 P.2d 449].) In weighing the equities, negligence or other fault of the insured is imputed to the surety seeking subrogation. (See American etc. Ins. Co. v. Capital Nat. Bk., supra, 75 Cal. App.2d 787, 792; Federal Ins. Co. v. Allen (1970) 13 Cal. App.3d 648, 650 [92 Cal. Rptr. 125].)
Following the rule of superior equities, California decisions have denied the right of subrogation to sureties on employee bonds where the surety has sought to recover from drawee banks the proceeds of payments on checks forged by the bonded employee. (See, e.g., Meyers v. Bank of America etc. Assn., supra, 11 Cal.2d 92; American etc. Ins. Co. v. Capital Nat. Bk., supra, 75 Cal. App.2d 787.) The rule has been applied in other situations, as for example to deny recovery by a surety on a fidelity bond seeking subrogated recovery against a purchaser of property stolen by the bonded employee from his employer (Federal Ins. Co. v. Allen, supra, 13 Cal. App.3d 648, 650); to deny recovery to a fire insurer of a subcontractor which asserted a claim based upon subrogation to its insured's right of action against a prime contractor for failure to procure its own fire insurance (Patent Scaffolding Co. v. William Simpson Constr. Co. (1967) 256 Cal. App.2d 506, 513-514 [64 Cal. Rptr. 187]); to deny recovery to the *603 insurer of a title company which sought recovery in subrogation from the employers of an employee who had procured the illegal releases of liens on property by the use of forged instruments (Fidelity & Deposit Co. of Maryland v. De Strajman (1963) 215 Cal. App.2d 10, 12-13 [29 Cal. Rptr. 855]); and to deny recovery to a surety of an employer who sued the purchaser of cotton stolen by the employee from the employer insured by the surety (J.G. Boswell Co. v. W.D. Felder & Co. (1951) 103 Cal. App.2d 767 [230 P.2d 386]).
The language of the California cases is not entirely consistent in defining the circumstances in which a surety has a superior equity which permits recovery.
In Meyers v. Bank of America etc. Assn., supra, 11 Cal.2d 92, our Supreme Court approved the rule of cases holding that the surety's equity does not become superior to that of the person against whom subrogation is asserted merely because that person is guilty of ordinary negligence. Rather, that person's participation in the wrongful act of the primary wrongdoer, "culpable negligence," or notice of the wrongdoing prior to payment is required. (Meyers, supra, at pp. 98-102.)
In Commercial Standard Ins. Co. v. Bank of America (1976) 57 Cal. App.3d 241 [129 Cal. Rptr. 91], however, the Court of Appeal held that an allegation that a bank had been negligent in disbursing construction loan proceeds contrary to its obligation to inspect was sufficient to withstand a general demurrer where the bank was sued by a surety as subrogee of a property owner's rights against a defaulting contractor whose obligation was insured by the surety. In Hartford Acc. & Indem. Co. v. Bank of America (1963) 220 Cal. App.2d 545 [34 Cal. Rptr. 23], the Court of Appeal, dealing with a nonsuit, held that the superior equities rule did not, as a matter of law, bar subrogated recovery by a surety which had issued a fidelity bond covering an employee who forged his employer's check where the bank paying the check negligently departed from banking custom and its own rules in not confirming the check's validity.
The apparent discrepancy in the language of the cases is explainable. Fault of the third person which creates the superior equity in the surety suing in subrogation must be related to the "primary cause" of the loss. (American etc. Ins. Co. v. Capital Nat. Bk., supra, 75 Cal. App.2d 787, 792.) Only if the person dealing with the wrongdoer is in a better position *604 to avoid the loss than is the insured or the surety does the surety have the superior equity permitting it to recover as a subrogee. (See Corker, Risk of Loss From Forged Indorsements: A California Problem (1951) 4 Stan.L.Rev. 24, 30.) In the case of the check forged by a bonded employee, the primary cause of the loss is the conduct of the dishonest employee. The action of the bank in paying the check is secondary. Absent some negligent conduct of a character which promotes or encourages the employee's fraud, the bank is not in a better position to avoid the loss than is the insured's employer. In the case of the bank negligently disbursing proceeds of a construction loan, the action of the bank is related to the primary cause of the loss. Because the bank undertook a contractual duty to inspect before disbursement, it placed itself in a superior position to avoid loss from a false claim to a sum disbursed. In the case of a bank grossly departing from its own and generally accepted practices, the trier of fact could find that the departure was the primary cause and the departure such that the bank failed to avoid the loss where it was in the best position to do so. (See also Barclay Kitchen, Inc. v. California Bank (1962) 208 Cal. App.2d 347, 350-351, 356-357 [25 Cal. Rptr. 383].)[1]
(2) In the case at bench, the primary cause of the loss was the theft by Manufacturers' employees or invitees of the treasury bills. Negligence of Manufacturers in failing to undertake minimal measures to protect the millions in dollars of negotiable securities contributed to the loss as did Manufacturers' negligent delay in reporting it. Negligence, if any, of Morgan, including any failure fully to comply with New York Stock Exchange rule 405 requiring that it learn the essential facts of its customer and his order, or any failure to require Marino to establish the legitimate acquisition of the negotiable securities, was secondary. The loss to Manufacturers had occurred prior to the time Morgan had anything to do with the stolen treasury bills. The record does not indicate that Morgan was in a better position to avoid the loss than was Manufacturers. Morgan's negligence, if any, was certainly no greater than the negligence of Manufacturers which is imputed to its subrogee. On those facts, the trial court's conclusion that Continental had not established a superior equity to Morgan is correct. (See Liberty Mut. Ins. Co. v. Kleinman (1957) 149 Cal. App.2d 404, 408 [308 P.2d 347].)
*605 Continental argues that in light of the presence of insurance covering Morgan's liability the rule of superior equities should not be applied. Granted that in some cases the proposition that the surety has been compensated for its risk is mentioned as a factor, the doctrine of superior equities, as applied in California, does not depend upon that fact. Rather, its basis is in the equitable nature of subrogation. (Patent Scaffolding Co. v. William Simpson Constr. Co., supra, 256 Cal. App.2d 506, 509.)[2]

Continental's Other Contentions
The bulk of Continental's contentions relate to findings of fact and evidentiary rulings leading to trial court conclusions that Morgan was not negligent and that it became a holder in due course of the treasury bills, alternative grounds of the court's decision in favor of Morgan. Because we have concluded that the trial court's decision is supported by the superior equities doctrine, we need not discuss those contentions.
Relying upon very much discredited testimony that Pillsbury was an accomplice of Marino, Continental claims error of the trial court in failing to make a finding of fact on that issue. The trial court, however, found that Morgan had acted in good faith and without negligence, findings that necessarily include findings of honesty of its employees acting within the scope of their employment. Continental does not claim that it requested a special finding with respect to Pillsbury's conduct.
Continental asserts, also, that the circumstances placed Morgan upon such notice of the possible dishonesty of Marino as to require Morgan to inquire further so that its failure of inquiry constitutes bad faith for the purpose of the superior equities rule. The record indicates, however, that Morgan was dealing with its customer in a form which did not depart materially from that which was usual. Even evidence of Continental's purported expert, which was barred for lack of expertise, would have shown nothing more than ordinary negligence in not checking Marino's source of acquisition of the treasury bills. Nothing in the record compels the inference of bad faith failure to follow up information which placed Morgan on notice of the possible stolen character of the treasury bills. While the call from the insurance agent to McPhail might support the *606 inference as to the last transaction, the evidence does not require the inference as a matter of law.

Facts re Insurance Coverage
Effective May 19, 1965, Aetna Insurance Company issued its brokers blanket bond to Morgan covering "Any ... loss sustained by reason of liability imposed ... by law ... through having, in good faith and in the ordinary course of business, whether for its own account or for the account of others, ... purchased or otherwise acquired, accepted or received, or sold or delivered, ... or otherwise acted upon any securities, obligations, or other written instruments which prove to have been ... lost or stolen...." The bond also provides that "The Underwriter will indemnify the Insured against court costs and reasonable attorneys' fees incurred and paid by the Insured in defending any suit or legal proceeding brought against the Insured to enforce the Insured's liability or alleged liability on account of any loss, claim or damage which, if established against the Insured, would constitute a valid and collectible loss sustained by the Insured under the terms of this bond."
A "discovery rider" to Aetna's bond provides that the bond covers losses "sustained by the Insured at any time but discovered after noon of the 19th day of May, 1965, and prior to the termination or cancellation of this bond...."
Late in August of 1970, McPhail, acting for Morgan, told Edward B. Lilly, Morgan's insurance broker and an authorized agent of Aetna, that Morgan had unwittingly purchased stolen treasury bills. In January of 1971, Lilly repeated the information to an underwriter in the surety department of Aetna, informing the underwriter that Morgan had handled $500,000 in "stolen bonds."
Because Aetna intended to withdraw from the financial institution market, Lilly procured a substitute brokers blanket bond from INA. That bond became effective on May 19, 1971. The INA coverage was, except for its term, essentially the same as that provided by Aetna. The INA bond indemnified Morgan "from and against any losses, ... sustained by the insured at any time but discovered after noon of the date hereof and prior to the termination or cancellation of this bond."
*607 Both Aetna and INA bonds contain an "Other Insurance" clause. That of Aetna states: "If the Insured carries or holds any other insurance or indemnity covering any loss or losses covered by this bond, the Underwriter shall be liable hereunder only for that part of such loss or losses which is in excess of the amount recoverable or recovered from such other insurance or indemnity." The INA clause states: "If the Insured carries or holds any other insurance or indemnity covering any loss or losses covered by this bond, the Underwriter shall be liable hereunder only for that part of such loss or losses which is in excess of the amount recoverable or recovered from such other insurance or indemnity."

Coverage
(3) Contrary to the contentions of Aetna and INA, the indemnity language of both bonds covers the court costs and legal expense incurred by Morgan in defending the action at bench, both at trial and on this appeal. Morgan was sued in conversion on a liability sought to be imposed by reason of Morgan's having dealt in stolen securities, a risk specifically covered by both bonds. The legal fees and court costs have been incurred in connection with that lawsuit.
(4) The determination of which of the two bonds is applicable to cover the loss here involved presents a closer question. The term of both bonds is expressed in substantially the same language. Each covers losses sustained at any time but discovered after the effective date. Morgan knew of the fact that Morgan had unwittingly dealt in stolen "bonds" before the termination of the Aetna bond and reported its knowledge to Aetna's agents. While Morgan thus knew of the facts that could eventually give rise to a covered loss, no claim was made against Morgan and nothing was paid by it until after termination of the Aetna bond and commencement of coverage by the INA bond.
The period of coverage stated in each bond is ambiguous when applied to the facts at bench. Each instrument states the period of coverage in essentially the same phraseology of losses whenever incurred but "discovered" after a specific date. As the trial court expressly found, that language can be construed to mean that a loss is discovered when the facts giving rise to a later claim are discovered by the insured, when a claim is made against the insured that may result in a judgment, or when the claim is settled or a judgment is paid.
*608 "Any ambiguity or uncertainty in the policy will be construed against the insurer in order to achieve the object of coverage for the losses to which the policy relates." (1 Witkin, Summary of Cal. Law (8th ed. 1973) Contracts, § 536.) Here both bonds are subject to a reasonable construction which affords coverage. The applicable principle of construction of insurance contracts requires that both be held to cover Morgan's attorneys' fees and court costs incurred in the case at bench. (5) Because both bonds purport to be excess insurance to other insurance, neither excess clause can be given any effect. Rather, the loss must be prorated in proportion to coverage. (Continental Cas. Co. v. Zurich Ins. Co. (1961) 57 Cal.2d 27, 35 [17 Cal. Rptr. 12, 366 P.2d 455].)
(6) Where two insurers cover the same risk, defense costs must also be shared between them pro rata in proportion to the respective coverage afforded by them to the insured. (Continental Cas. Co. v. Zurich Ins. Co., supra, 57 Cal.2d at p. 35.)
We thus conclude that the trial court erred in concluding that Aetna's bond constituted primary insurance in the case at bench. Because the record is not clear on the relative extent of coverage afforded by the Aetna and INA bonds, the matter must be returned to the trial court so that it may accomplish the proration.

Disposition
That portion of the judgment which denies recovery to Continental is affirmed. The portion of the judgment which finds Aetna primarily liable for all of Morgan's attorneys' fees and court costs is reversed with instructions to the trial court to: (1) determine the additional amount due to Morgan for reasonable attorneys' fees and court costs incurred or paid in defending against Continental's appeal; and (2) to prorate liability between Aetna and INA for Morgan's attorneys' fees and court costs incurred at trial and on appeal on the relative coverage of the bond issued by each. Defendant, Morgan, is to recover its costs on appeal. Aetna and INA are to bear their own costs.
Lillie, Acting P.J., and Hanson, J., concurred.
The petition of appellant Insurance Company of North America for a hearing by the Supreme Court was denied October 4, 1978.
NOTES
[1] The right of subrogation may also be based upon a contractual obligation of the person against whom it is asserted where by agreement that person assumes "primary liability" for the loss. (Meyer Koulish Co. v. Cannon (1963) 213 Cal. App.2d 419, 428-429 [28 Cal. Rptr. 757].) The case at bench does not involve that situation.
[2] Continental asserted at oral argument that the recently adopted California rule of implied proportionate indemnity is applicable to the case at bench. We treat that contention as untimely and do not consider it.