**FIDELITY SAVINGS AND LOAN ASSO-CIATION, Plaintiff-Appellant, Cross-Appellee,**

v.

**AETNA LIFE & CASUALTY COMPANY, Defendant-Appellee, Cross-Appellant.**

Nos. 79–4541, 79–4588.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 9, 1981.

Decided June 8, 1981.

Jon Henry Kouba, Adams, Kouba & Dickson, San Francisco, Cal., for plaintiff-appellant, cross-appellee.

Douglas M. Moore, Jr., Sedgwick, Detert, Moran & Arnold, San Francisco, Cal., for Aetna Life.

Before MERRILL and FLETCHER, Circuit Judges, and HANSON,* District Judge.

MERRILL, Circuit Judge:

At the time of the failure of the San Francisco National Bank (SFNB), the predecessor of appellant Fidelity Savings and Loan Association had on deposit with the bank the sum of $203,046.50 in certificates of deposit and accrued interest. In the course of receivership, FDIC, as receiver, paid $125,480.23 in liquidating dividends and $10,000 in deposit insurance, leaving $67,566.27 unpaid. At the time of the bank's closure, appellant's predecessor was insured by appellee Aetna Life & Casualty Company by a standard savings and loan blanket bond, with a limit of liability of $510,000. Clause E of the bond provided that Aetna would indemnify the insured against "any loss of property through any other form of fraud or dishonesty by any person or persons, whether employees or not."

Fidelity has brought this action against Aetna, contending that its loss was due to fraudulent and dishonest acts on the part of the bank's management, which caused closure and failure of the bank. The district court, following bench trial, entered judgment in favor of Fidelity for approximately 70 percent of its claim. Fidelity has taken this appeal, contending that it should have judgment for its unpaid claim in its entirety. Aetna has taken a cross appeal, seeking new trial because of certain alleged procedural errors.

*Fidelity's Appeal*

The district court in its opinion stated the factual background as follows:

"A brief history will help place the issues raised by the parties into context. The San Francisco National Bank began operations approximately June 1, 1962. Management of the bank was largely vested in Donald G. Silverthorne, its president and board chairman. Almost from the bank's inception, Silverthorne engaged in the practice of extending credit of the bank in exchange for the payment of 'loan fees.' Such fees, over and above normal interest charges, were personally pocketed by Silverthorne. In some cases they were split between Silverthorne and Mr. William B. Bennett, whose personal guarantee was frequently the basis for extension of credit. Over 60 borrowers paid loan fees kept by Silverthorne.

Most of the borrowers receiving credit in exchange for loan fees were not creditworthy. Combined with a large number of additional uncollectable loans, not involving loan fees, the assets of the bank were seriously weakened.

These conditions were discovered by the Comptroller of the Currency during the course of a routine examination of the bank conducted in May and June, 1964. The Comptroller ordered weekly visitations to the SFNB by federal bank examiners, as a means of monitoring efforts to strengthen the bank's financial position. The bank was able to meet its obligations as they fell due during the remainder of 1964 only through heavy borrowing from the Federal Reserve Bank. The SFNB did not have sufficient resources, however, to meet the demands created by a heavy concentration of certificates of deposit maturing in January,

---

* Honorable William C. Hanson, Senior United States District Judge of the Southern District of Iowa, sitting by designation.

1965. On January 22, 1965, the bank was finally closed by the Comptroller of the Currency."

440 F.Supp. 862, 865 (N.D.Cal.1977).

The theory of liability adopted by the district court was that Fidelity's loss was caused by the failure of borrowers to repay loans. The court found that some uncollectable loans had been granted honestly while others were the product of dishonest dealings. The court ruled that only that proportion of loss arising from the nonpayment of dishonest loans should be attributed to dishonesty and thus recoverable under the bond. It held those loans to be dishonest where the borrowers were found not to be creditworthy and where the loan had been granted after payment of the loan fee, or had been granted to enable the borrower to buy SFNB capital stock. Using this standard approximately 70 percent of the total unpaid loans were found to be dishonest. Judgment for Fidelity was entered for that proportion of its unpaid balance.

Fidelity contends that the district court's standard of dishonesty was too narrow. It offers two alternative theories of liability to show that its entire loss is recoverable as caused by dishonesty. First, it argues that all loans granted or deposits accepted by the bank officers with knowledge of the bank's insolvency constituted dishonest acts. For purposes of this argument it contends that insolvency should be deemed to exist where a bank's liabilities are greater than its assets. (Fidelity imports this definition—the so-called "bankruptcy definition" of insolvency from its reading of cases defining that term as it is used in the National Bank Act, 12 U.S.C. § 21 et seq.) It contends that substantially all of the unpaid loans were granted or extended after the bank officers had knowledge that the bank's liabilities were greater than its assets, and thus represented dishonest acts.

■ The district court did not consider the National Bank Act's meaning of "insolvency" to be dispositive. It refused to accept the bankruptcy definition of insolvency and adopted, instead, the "equity defini-

tion": a bank is insolvent if it is unable to meet its obligations as they mature. We agree with the district court.

The purpose of the bankruptcy definition under the National Bank Act cases is to fix a point at which it is proper for the Comptroller to step in and attempt to rescue a failing bank. This can hardly be useful in determining the point at which it is fraudulent or dishonest for a bank to continue to engage in business. The use of the equity definition is appropriate in this case. The whole purpose of a takeover by the Comptroller is to permit the bank to continue in business as a going concern until inability to meet its obligations as they mature requires closure. As the district court stated:

"Acting as representative of the public interest, the Comptroller determined that the SFNB should remain open while various efforts were made to salvage it and reduce loss to depositors. To characterize as dishonest the acceptance of deposits during this period would not only unduly strain the concept of 'dishonesty,' but also quite possibly interfere with the discretion accorded the Comptroller under 12 U.S.C. § 192."

Moreover, in those cases dealing with fraud in the acceptance of deposits or granting of loans, the condition of a bank's balance sheet is not dispositive. Under *Fidelity and Deposit Co. of Maryland v. Kelso State Bank*, 287 F.2d 828, 830 (9th Cir. 1923), fraud will not be found unless the bank is in a state of "hopeless and irretrievable insolvency." Here the Comptroller's actions after taking over the bank demonstrate that SFNB was not hopelessly insolvent at the time the loans in question were granted or deposits made. The Comptroller not only permitted the bank to engage in business; he allowed the opening of a new branch office.

■ Fidelity's alternative theory of liability is that the dishonest loans alone were enough to render it impossible for the bank to meet its obligations and thus were the cause of the bank's closure, and, in turn, the cause of Fidelity's loss. The district court

found that Fidelity failed to establish that dishonesty was responsible for its entire loss. We agree with the district court that the failure of all borrowers to pay their debts must be taken into account in fixing the cause for the bank's failure.

Finally, Fidelity assigns as error the failure of the district court to allow prejudgment interest. It seeks interest from the date of the bank's closure, January 22, 1965. The court allowed interest only from August 31, 1977, the date of the court's order fixing liability.

The right to prejudgment interest in this case is governed by California Civil Code § 3287, which provides:

"(a) Every person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in him upon a particular day, is entitled also to recover interest thereon from that day * * *."

The policy behind that section is that a debtor should not be held accountable for prejudgment interest when he could not have paid earlier because of the uncertainty over amount of damages.

"The rationale of such rule is that where a defendant does not know what amount he owes and cannot ascertain it except by accord or judicial process, he cannot be in default for not paying it."

*Macomber v. California,* 250 Cal.App.2d 391, 400–01, 58 Cal.Rptr. 393, 400 (1967).

In construing California law on prejudgment interest, this court has noted that the crucial inquiry is not how damages are calculated but whether a defendant is able to calculate them. *Seaboard Surety Co. v. United States,* 355 F.2d 139, 146 (9th Cir. 1966). In that case we found that although the total damage figure at stake on a contract dispute might have been calculable, the percentage of that amount for which the appellate was ultimately liable was not readily apparent. Because the amount due was "ascertainable only by judicial determination after a consideration of conflicting evidence," no prejudgment interest was awarded. *Id.* at 146.

In the present appeal the extent of Aetna's liability for damages required ascertainment of what constituted dishonest loans for purposes of recovery under the bond. We conclude that judgment of the district court denying prejudgment interest was proper.

### Aetna's Cross Appeal

1. Aetna claims that the district court was guilty of abuse of discretion in denying Aetna's motion to dismiss Fidelity's action for want of prosecution under Rule 41(b), Federal Rules of Civil Procedure, which motion was filed six years and two months after commencement of the action. During that period the action had been removed from state court to federal court and had been consolidated with other cases involving SFNB. Pretrial motions were litigated and discovery went forward. Delay in bringing this case to trial was due to some extent to its consolidation with other cases, but court time was probably saved in the long run by the consolidation. Aetna has made no showing of prejudice. We find no abuse of discretion. *See Anderson v. Air West, Inc.,* 542 F.2d 522 (9th Cir. 1976).

2. Aetna claims that the district court was guilty of abuse of discretion in requiring that Aetna's offer of proof by expert testimony be in the form of a written witness statement, rather than by question and answer. Under Rule 103(b), Federal Rules of Evidence, the form of offers of proof is left to the discretion of the trial court. This rule became effective during the course of trial in this matter, but the enacting provision of the rules provides that the rule shall "apply to further procedures in actions * * * then pending," save when this would "work injustice." Public Law No. 93–595 § 1, 88 Stat. 1926. Aetna has made no showing of prejudice. We find no abuse of discretion.

3. As an affirmative defense to Fidelity's claim, Aetna contends that Fidelity did not comply with the bond's requirement that Aetna be given notice of loss "at the earliest practicable moment after discovery

of any loss hereunder." While the bank closure occurred on January 22, 1965, Fidelity did not notify Aetna until October 13, 1965. The district court ruled that there must be discovery both of the loss and of the dishonesty. Discovery of the dishonesty occurred when Silverthorne, the bank president, was indicted on September 8, 1965. At that time, however, it was still unclear that there was a loss. The court found that Fidelity's officers did not discover the fact of its loss until October, 1965, because until then there was a possibility that SFNB might reopen. Fidelity's lawyer, who gave notice to Aetna, testified:

"[I]t was my own belief that one of the plans to reorganize and reopen the SFNB would succeed; or, alternatively, that the FDIC would arrange for a merger of the SFNB with another bank that was in a strong financial condition * * *."

In our judgment the court finding was not clearly erroneous.

4. As an affirmative defense Aetna contends that Fidelity failed to comply with the bond's requirement that a proof of loss be filed within six months of the discovery of the loss. Fidelity's only action in this respect was to request, in January, 1967, that Aetna forward a form of proof of loss, which request Aetna denied. California law does not require strict compliance with insurance notice clauses, unless the insurer can show actual prejudice by virtue of delay. *Moe v. Transamerica Title Insurance Co.*, 21 Cal.App.3d 289, 98 Cal.Rptr. 547 (1971); *Northwestern Title Insurance Co. v. Flack*, 6 Cal.App.3d 134, 85 Cal.Rptr. 693 (1970). The court found that no prejudice had been suffered. It stated:

"In the present action, Aetna has asserted no prejudice resulting from delays in notice or in the filing of the proof of claim, and it appears very doubtful on the facts that prejudice could have been shown. Aetna undertook its own investigation of the claim, lasting from at least October 1965 to November 1967.

In our judgment the court finding was not clearly erroneous.

5. As an affirmative defense Aetna contends that Fidelity's action was time barred. The bond required that suit be brought within two years of discovery of loss. This action was filed September 29, 1967, which was within two years of the date of discovery of loss as found by the district court.

6. Aetna argues that the court erred in refusing to admit extrinsic evidence concerning the historical development and interpretation of Clause E, the clause in the bond upon which Fidelity bases its right to recover. After receiving briefs from the parties and an offer of proof on this issue, the district court, in a lengthy opinion, had excluded this evidence before trial as irrelevant to the parties' intent in using Clause E. The judge found that Aetna's proferred historical interpretation was not binding on Fidelity, and that it had failed to establish that its interpretation had become trade usage. We are not persuaded by Aetna that the district court's ruling was clearly erroneous.

On both appeals, judgment is affirmed. No costs are awarded.