[Civ. No. 26454. Fourth Dist., Div. One. Apr. 10, 1985.]

PACIFIC-SOUTHERN MORTGAGE TRUST COMPANY,
Plaintiff and Respondent, v.
INSURANCE COMPANY OF NORTH AMERICA,
Defendant and Appellant.

704

COUNSEL

Leonard S. Levy and Peter R. Regal for Defendant and Appellant.

Luce, Forward, Hamilton & Scripps and Jack W. Crumley for Plaintiff and Respondent.

OPINION

**WORK, J.**—Insurance Company of North America (INA) appeals a judg-ment awarding damages to Pacific-Southern Mortgage Trust for INA's bad

faith in refusing to settle a claim made on a commercial blanket bond issued by INA to Pacific-Southern.

Palomar Financial (a subsidiary of Standard Life Corporation (Standard Life)) started two real estate investment trusts (REITs): (1) Palomar Mortgage Investors (Palomar Mortgage), a short-term lender, and (2) Pacific-Southern Mortgage Trust Company (Pacific-Southern), a "long-term" lender. The day-to-day operation of each REIT was handled by a management company: Palomar Mortgage by P.M.I. Management Corp.; Pacific-Southern by Pacific-Southern Advisors.

Perry Davis was an officer of Palomar Financial. He was later made president and controller of P.M.I. Management Corp. As a result, Davis made the day-to-day investment decisions for Palomar Mortgage subject to periodic approval of the Palomar Mortgage trustees. Davis was also the president, treasurer and a trustee of Pacific-Southern and a corporate director of its management company. As president of Pacific-Southern, Davis also sat on its loan committee which met contemporaneously with the executive committee to discuss loans exceeding the advisor's authority.

Shortly after the organization of Pacific-Southern in April 1973, at the first joint meeting of the loan and executive committees, Davis made a presentation seeking Pacific-Southern's subparticipation of $1.5 million in Palomar Mortgage's $4 million participation in a $16 million loan to Joe P. Farina. Davis made numerous misrepresentations about the loan and, based on them and some later phone calls, the committee approved Pacific-Southern's subparticipation. Davis' fraudulent acts are not here in dispute.

In September 1974, Pacific-Southern sought to rescind its subparticipation agreement because of irregularities in the loan documentation and representations made: the loan's originator was not a Standard Life subsidiary as represented, the loan was subject to prior liens and the take-out commitment was not obtained from the entity originally represented. Palomar Mortgage refused to rescind.

Meanwhile, unknown to Davis or Pacific-Southern, the originator of the Farina loan had given Farina a written agreement to extend the loan one year at Farina's request. Farina so requested, and the loan was extended from April 25, 1975, to April 25, 1976. Then the participants in the loan (excluding Pacific-Southern) agreed to extend the loan to October 25, 1976, in exchange for Farina's agreement to accept personal liability and to relinquish any claim of usury.

On September 12, 1975, Pacific-Southern sued Palomar Mortgage in federal court seeking to have the subparticipation agreement set aside and alleging Davis was acting for Palomar Mortgage in making fraudulent representations to Pacific-Southern.

After the federal court case was at issue, the parties agreed to withhold discovery and trial preparation until the loan was paid off or went into default. On October 26, 1976, the loan went into default. Foreclosure sale occurred in April 1977, and settlement with Palomar Mortgage occurred in 1978.

On December 21, 1976, Pacific-Southern first notified INA it had a potential claim on the commercial blanket bond issued by INA which indemnified Pacific-Southern for fraudulent acts committed by its employees up to $1 million. INA refused to indemnify. On November 18, 1977, Pacific-Southern sued INA for its failure to indemnify. INA cross-complained against Davis.

Trial proceeded on Pacific-Southern's causes of action for breach of the insurance contract and breach of the implied covenant of good faith and fair dealing. INA denied Pacific-Southern was covered for this loss and, even if it were, Pacific-Southern could not recover since suit was not filed within the time limits of the bond.

The case was tried to two juries before the same judge. The first trial ended in a mistrial when the jury failed to agree on whether Davis committed a fraud. The legal, equitable and damages issues were resolved by the court after the second jury resolved the factual issues of whether a fraud was committed and when the fraud and loss were discovered. The trial court decided Pacific-Southern's loss was covered by the bond and INA breached its duty of good faith in failing to investigate or negotiate the claim. Pacific-Southern was awarded $1,710,000.

INA appeals, alleging insufficiency of evidence to support the findings of the timeliness of suit and bad faith. INA additionally contends there were errors in the instructions, in awarding attorney's fees and in determining the amount of damages.

I

INA contends Pacific-Southern's action against INA was barred because Pacific-Southern failed to sue within two years after discovery of its loss as required by the bond.

Section 15 of the commercial blanket bond requires notice of loss "upon knowledge or discovery of loss under this bond." The third paragraph of section 15 states, in pertinent part: "No action shall lie against the Underwriter unless, as a condition precedent thereto, there shall have been full compliance with all the terms of this bond, nor until ninety days after the required proofs of loss have been filed with the Underwriter, nor at all unless commenced within two years from the date when the Insured discovers the loss."

This limitation period is shorter than that under Code of Civil Procedure section 337, which would apply in this case absent the provision. California courts have consistently upheld limitation periods in insurance policies which are shorter than the statutory period (*Tebbets* v. *Fidelity & Casualty Co.* (1909) 155 Cal. 137, 138 [99 P. 501]; *Fageol T. & C. Co.* v. *Pacific Indemnity Co.* (1941) 18 Cal.2d 748, 753 [117 P.2d 669]).

When "discovery of the loss" occurs has been the subject of a great deal of litigation. (See Woods, "Conditions to Recovery: Notice, Proof of Loss and Timeliness of Filing Suit" in Bankers and Other Financial Institution Blanket Bonds (A.B.A. 1979) p. 395.) "Discovery" has been variously defined as occurring when "facts giving rise to a later claim are discovered by the insured, when a claim is made against the insured that may result in a judgment, or when a claim or judgment is settled" (*US LIFE Savings & Loan Assn.* v. *National Surety Corp.* (1981) 115 Cal.App.3d 336, 346 [171 Cal.Rptr. 393]; *Continental Ins. Co.* v. *Morgan, Olmstead, Kennedy & Gardner, Inc.* (1978) 83 Cal.App.3d 593, 607 [148 Cal.Rptr. 57]), or as "knowledge which would justify a careful and prudent [person] in charging another with fraud or dishonesty" (*Hidden Splendor Mining Co.* v. *General Ins. Co. of America* (10th Cir. 1966) 370 F.2d 515, 517, and cases cited therein).

 To constitute "discovery" of the loss, the insured must have more than a mere suspicion that a covered loss has occurred (*Pacific Coast A. Bureau* v. *Insurance Co.* (1931) 115 Cal.App. 583, 586 [2 P.2d 218]; *L. A. Athletic Club* v. *U.S. Fidelity etc. Co.* (1919) 41 Cal.App. 439, 447 [183 P. 174]). There must be discovery of both the loss and the dishonesty (*Fidelity S. & L. Ass'n* v. *Aetna Life & Cas. Co.* (9th Cir. 1981) 647 F.2d 933, 938). However, "discovery" does not depend on the insured's knowledge or discovery of the full scope and exact details of the affair (*City Loan & Sav. Co.* v. *Employers Liability Assur. Corp., Ltd.* (N.D. Ohio 1964) 249 F.Supp. 633, 658, affd. without opinion, 356 F.2d 941 (6th Cir.), and cases cited therein), nor encompass a later understanding of previously known facts or a later recognition of coverage within the terms of the fi-

delity bond (*US LIFE Savings & Loan Assn.* v. *National Surety Corp., supra,* 115 Cal.App.3d 336, 346).

Ordinarily, a "loss" occurs in this context when the insured parts with money due to the fraud or dishonesty of an employee. (See *First Thrift of L. A.* v. *Pacific Indem. Co.* (1949) 95 Cal.App.2d 460, 462 [212 P.2d 560]; *Fidelity Savings & L. Ass'n* v. *Republic Insurance Co.* (9th Cir. 1975) 513 F.2d 954, 956). Under the general rule, the loss occurs at the time of the dishonest acts not when the insured is required to make good on the loss (see *Mount Vernon Bank & Trust Co.* v. *Aetna Casualty & Sur. Co.* (E.D. Va. 1963) 224 F.Supp. 666, 670), nor when the insured obtains a final adjudication of the loss (*Fidelity Savings & L. Ass'n* v. *Republic Insurance Co., supra,* 513 F.2d 954, 956).

This general rule makes sense in the majority of the cases where the dishonest acts and the loss occur at the same time such as when the loss is due to forged instruments or embezzlement. However, in the case of a secured loan made because of fraudulent misrepresentations, the fraud and the loss do not necessarily occur at the same time. The loss may occur much later *or not at all* since the debtor may eventually become creditworthy or the underlying property may appreciate in value so that no actual loss is ever suffered.[1]

In decisions involving loans extended due to the dishonesty of employees, the courts have been inconsistent in determining when the loss occurs. Some courts seem to hold that the loss occurs when the improper loan was made (see, e.g., *Miami National Bank* v. *Pennsylvania Insurance Co.* (S.D. Fla. 1970) 314 F.Supp. 858; Schoonover, *Discovery, Notice & Automatic Cancellation Under Revised Form 24* (1981) 16 Forum 962, 967 (". . . a loss may be . . . sustained before or *after* discovery . . . .")). Other courts seem to hold the loss does not occur until the fact of the loss becomes clear (see,

---

[1]INA's policy makes it clear if the "fraudulent or dishonest act" occurs during the policy period, liability attaches regardless of when the "loss" occurs.

"In consideration of an agreed premium, INSURANCE COMPANY OF NORTH AMERICA, a corporation of the Commonwealth of Pennsylvania, with its Home Office in the City of Philadelphia, hereinafter called Underwriter, hereby agrees to indemnify PACIFIC-SOUTHERN MORTGAGE TRUST & PACIFIC-SOUTHERN ADVISORS, INC. of 2022 Camino Del Rio North, San Diego, California hereinafter called Insured *against any loss of money or other property* belonging to the Insured, or in which the Insured has a pecuniary interest, or for which the Insured is legally liable, or held by the Insured in any capacity whether the Insured is legally liable therefor or not, which the Insured shall sustain and discover as provided in Section 1, to an amount not exceeding in the aggregate sum of One Million & no/100 Dollars ($1,000,000.00) *through any fraudulent or dishonest act or acts committed* by any one or more of the Employees as defined in Section 3, acting alone or in collusion with others, *during the term of this bond* as defined in Section 1." (Italics added.)

e.g., *Fidelity S. & L. Ass'n* v. *Aetna Life & Cas. Co., supra,* 647 F.2d 933).

What little California case law exists on this point is unclear as to when the loss itself occurs when the fraud and actual loss of money do not occur at the same time. In *US LIFE Savings & Loan Assn.* v. *National Surety Corp., supra,* 115 Cal.App.3d 336, a savings and loan association suffered losses due to the dishonesty of its employees in handling a student loan program. While the court discussed the term "discovery of the loss," concluding "a loss is discovered when the insured acquires knowledge of any fraudulent or dishonest act resulting in loss" (115 Cal.App.3d at p. 346), the court did not discuss when the loss occurred but seemed to equate the loss with the fraudulent act. Under the facts there, the losses occurred and were discovered during the effective period of a previous bond and no new facts were discovered during the period of the bond on which the lawsuit was brought.

Similarly unhelpful in providing a definite answer is *Continental Ins. Co.* v. *Morgan, Olmstead, Kennedy & Gardner, Inc., supra,* 83 Cal.App.3d 593. In that case, the issue was which of two bonds covered losses discovered during the bond period for attorney's fees and court costs incurred by the insured in defending a lawsuit over stolen securities. The court found the term "discovery of the loss" ambiguous and held both bonds provided coverage; the first since it covered a time period when the insured learned its employee had dealt in stolen bonds, the second since it covered a time period when the attorney's fees and costs were incurred in defending a lawsuit arising from dealing in stolen securities.

We think the term "discovery of the loss" is not ambiguous. By its plain meaning, it means that time when the insured discovers it has suffered a *loss,* not that time when it discovers it has a *potential loss.* If INA had wanted the notice and the limitations period to start upon the discovery of the fraud, it could have so stated. Indeed, some blanket fidelity bonds expressly require the insured report "an occurrence which may give rise to a claim" (see *St. Paul Fire and Marine Insurance Co.* v. *Bank of Stockton* (N.D. Cal. 1962) 213 F.Supp. 716; *Federal Deposit Insurance Corporation* v. *Lott* (5th Cir. 1972) 460 F.2d 82; Conners, California Surety & Fidelity Bond Practice (Cont.Ed.Bar 1969) § 16.18, p. 241).

Furthermore, INA's bond does not provide indemnity against liability, but indemnity against loss, and as such does not cover anticipated or even uncertain future losses but only actual losses (see *Gribaldo, Jacobs, Jones & Associates* v. *Agrippina Versischerunges A.G.* (1970) 3 Cal.3d 434, 446

[91 Cal.Rptr. 6, 476 P.2d 406]; Skillern (ed.), *Annotated Bankers Blanket Bond* (1st Supp. A.B.A. 1983) p. 5). Thus, it is logical to start the running of the bond's limitation period upon discovery of a real loss rather than discovery of an anticipated loss.

Relying on the jury's answers to special interrogatories,[2] the trial court concluded the notice of loss, the proof of loss and the commencement of suit were all timely. The court apparently selected October 26, 1976, as the date Pacific-Southern discovered it had suffered a covered loss. This finding is supported by substantial evidence. October 26, 1976, was the date the Farina loan defaulted. While Pacific-Southern had discovered the fraud at least by September 12, 1975, when it filed suit in federal court against

---

[2]The jury's answers to the special interrogatories are as follows:

"1) Did PERRY DAVIS commit fraud in making representations to PSMT's trustees about the Farina loan in which PSMT participated?

"Answer 'Yes' or 'No'.

"Answer: Yes.

"2) If the answer to the first question is 'Yes', did PERRY DAVIS commit the fraud while acting within the scope and course of his duties either as an employee of PSMT or as a member of a committee duly elected or appointed by a resolution of the board of trustees to perform specific, as distinguished from general, directorial acts on behalf of PSMT?

"Answer 'Yes' or 'No'.

"Answer: Yes.

"3) If your answers to questions 1 and 2 are 'Yes'

"(a) on what date did PSMT have actual knowledge that it suffered a loss as a result of fraud committed by DAVIS even though the full extent of the loss might not have been known on that date?

"Answer: October 26, 1976.

"(b) On what date did PSMT have sufficient knowledge to put a reasonably prudent person on notice that it has suffered a loss as a result of fraud committed by DAVIS, even though the full extent of the loss might not have been known on that date?

"Answer: October 26, 1976.

"4) By what date did any officer, employee or trustee of PSMT, other than DAVIS or any such person acting in collusion with him, discover that a fraud had been committed?

"Answer: September 12, 1975.

"5) On what date did PSMT discover the loss?

"Answer: September 12, 1975.

"5)(1) By the date found in question number 5, did PSMT then know that such a loss was occasioned by:

"(a) a fraud committed by PERRY DAVIS Yes _X_ No ___

"(b) And if the answer is yes, did it know that he had acted in the capacity described in question number 2 above? Yes ___ No _X_

"6) Did INA violate its legal duty to attempt in good faith to effectuate prompt, fair and equitable settlement of the claim as to which liability has become reasonably clear?

"Answer 'Yes' or 'No.'

"Answer: Yes.

"7) If your answer to question number 6 is 'Yes', on what date had liability become reasonably clear?

"Answer: January 14, 1977.

"Dated July 14, 1980.

"/s/ Millard Biggs FOREMAN."

Palomar Mortgage, at that time the loss was merely anticipated. Upon the default, it was established there would be no repayment of the loan.

■ ■ The jury selected two different dates, September 12, 1975 (more than two years before suit was filed) and October 26, 1976 (less than two years before suit was filed). This does not render the verdict so hopelessly ambiguous, inconsistent, or incomprehensible that a reversal is required (see *Tri-Delta Engineering, Inc.* v. *Insurance Co. of North America* (1978) 80 Cal.App.3d 752, 758 [146 Cal.Rptr. 14]).

It seems apparent that since the court instructed the jury a loss occurs when the insured parts with its money due to the dishonesty of an employee, the court was essentially instructing the jury the loss could be equated with the fraud. Thus, the jury's selection of September 12, 1975 (the date Pacific-Southern filed its federal suit against Palomar Mortgage and Davis) may reasonably be interpreted as the date the jury selected for Pacific-Southern's discovery of the *fraud,* leaving October 26, 1976 (the date of default on the loan), as the date the jury selected for Pacific-Southern's discovery of the *loss.*

INA also contends the court erred in including interrogatory 5(1)(b), and that the jury's response to it must be ignored. Since we are holding the loss occurred when the loan defaulted, we need not decide whether Pacific-Southern discovered Davis' covered capacity at an earlier time. We do note it was crucial Pacific-Southern discover not only the loss but also that it was due to the dishonesty of a *covered* individual before the limitation period would begin. However, there is merit to INA's contention that if the timeliness of Pacific-Southern's suit depended solely on its realization of Davis' covered capacity, the suit probably would be time-barred under the reasoning of *US LIFE Savings & Loan Assn.* v. *National Surety Corp., supra,* 115 Cal.App.3d 336, 346.

The "loss" here did not, as Pacific-Southern contends, occur at the time of the foreclosure sale in April 1977, since an insured need not pursue possible remedies in order to establish its actual loss. A foreclosure sale here was a remedy, a method of mitigating the loss, not the loss itself.

## II

■ INA contends the trial court's instructions to the jury on the meaning of fraud or dishonesty under INA's bond constituted prejudicial error. Specifically, INA argues the court erroneously instructed the jury that mere

negligent representations would constitute fraud and an intent to defraud could be inferred from a mere breach of duty by a fiduciary.

■ In determining whether jury instructions are in error or prejudicially ambiguous, the instructions must be considered as a whole (*Valdez* v. *J. D. Diffenbaugh Co.* (1975) 51 Cal.App.3d 494, 511 [124 Cal.Rptr. 467]). ■ If the law given to the jury is correct, it is necessary the party requested a qualifying instruction below or else any claim of error or prejudice is waived on appeal (*Agarwal* v. *Johnson* (1979) 25 Cal.3d 932, 948-949 [160 Cal.Rptr. 141, 603 P.2d 58]; *Delia S.* v. *Torres* (1982) 134 Cal.App.3d 471, 483 [184 Cal.Rptr. 787]).

■ Here, the trial court gave extensive instructions (some 168 pages of transcript) at the beginning of trial and both before and after closing arguments.

The disputed instructions occurred after INA's counsel contended the court's instructions would mislead the jury into believing intent to defraud could be founded on a mere negligent misrepresentation or upon a simple breach of a trustee's duties. In response to counsel's remarks, the trial court again reminded the jury they had to find an actual intent to defraud and the "garden variety of negligence" was not enough. The court then explained people rarely state aloud "I intend to defraud by telling you this," so that it was necessary to infer intent from circumstantial evidence. The court then gave some examples.

In the first example, the court used a person asking a wino for directions to the courthouse. The wino gives wrong directions, making a misrepresentation as to the location of the courthouse. Under these circumstances, the court suggested the wino probably lacked an intent to defraud.

In the second example, the judge used a trustee asking his cotrustee if all the documents had been collected for a transaction. The cotrustee, knowing his memory was hazy and knowing the other trustee would rely on all the documents being present to make his decision about the transaction, relies on his hazy memory and tells the other trustee all the documents are collected. The court suggested in this circumstance, considering the cotrustee's duties, the jury could use the cotrustee's act of relying on his admittedly hazy memory as one piece of circumstantial evidence showing the cotrustee had an intent to defraud.

The court did not instruct the jury a simple breach of a trustee's duties amounted to fraud. INA did not request further clarifying instructions.

Nothing in the record indicates the court would not have given further instructions if they had been requested.

When all the instructions are read together, it is apparent the trial court correctly instructed the jury they needed to find an actual intent to defraud and a mere negligent misrepresentation was insufficient to find fraud. The trial court here committed no prejudicial instructional error.

### III

INA contends there is insufficient evidence to support the trial court's finding that on February 11, 1977, INA breached its duty of good faith to effectuate a prompt and fair settlement of Pacific-Southern's claim.

An insurer is under an obligation to act fairly and in good faith in discharging its contractual responsibilities. If it fails to deal fairly and act in good faith, by refusing, without proper cause, to compensate the insured for a loss covered by the policy, such conduct may give rise to a cause of action in tort for breach of the implied covenant of good faith and fair dealing (*Gruenberg* v. *Aetna Ins. Co.* (1973) 9 Cal.3d 566, 575 [108 Cal.Rptr. 480, 510 P.2d 1032]).

The jury found INA violated its legal duty to attempt in good faith to effectuate a prompt, fair and equitable settlement of the claim as to which liability had become reasonably clear, and that liability had become reasonably clear on January 14, 1977. The trial court also concluded INA breached its covenant of good faith and liability became reasonably clear on February 11, 1977. This is not necessarily inconsistent with the jury's finding. January 14, 1977, was the date Pacific-Southern submitted a detailed proof of loss; February 11, 1977, was the date INA responded to Pacific-Southern's claim by denying it.

There is sufficient evidence even in the partial record before us to support the court's determination. By February 11, 1977, INA was apprised of all the underlying facts regarding the claim. No further investigation was necessary to establish the claim was covered since Davis was clearly covered under the director/trustee rider attached to the bond, and further, the notice was timely (provided not long after the default and well before the foreclosure sale).

There is also substantial evidence to support the determination INA breached its duty of good faith since, even though its liability was reasonably clear on February 11, 1977, INA conducted no investigation, but flatly

refused the claim. INA made no attempts to effect a settlement with Palomar Mortgage, Davis, or Farina. Further, INA made no effort to find purchasers for the Farina property or to act in any other way that might result in mitigation of the loss.

## IV

INA argues there is insufficient evidence to support the court's seventh conclusion of law that Pacific-Southern suffered any consequential damages as a result of INA's denial of the claim.

Conclusion of law number seven reads: "7. Defendant is liable further to plaintiff for all damages in excess of the penal sum of the bond sustained by plaintiff as a consequence of defendant's violation of its legal duty to attempt in good faith to effectuate prompt, fair and equitable settlement of the claim to which liability had become reasonably clear by February 11, 1977."

The trial court awarded Pacific-Southern $1,710,000; $1 million for the penal amount of the bond, Pacific-Southern's first cause of action for breach of contract, and $710,000 for Pacific-Southern's third cause of action for breach of the covenant of good faith. The findings of fact make it clear the $710,000 represents $425,000 in prejudgment interest and $285,000 in attorney's fees.

Prejudgment interest is a proper award when the insured recovers on a fidelity bond (see *Pellas* v. *Ocean Acc. & Guar. Corp.* (1938) 24 Cal.App.2d 528 [75 P.2d 635]; *Pacific Coast A. Bureau* v. *Insurance Co., supra,* 115 Cal.App. 583). Thus, there was no error here.

INA also disputes the amount of interest awarded. In the absence of any legislative act to the contrary, the rate of prejudgment interest is 7 percent (Cal. Const., art. XV, § 1). Civil Code section 3287, which governs prejudgment interest for contract claims, does not set a rate different from 7 percent (contrast Civ. Code, § 3291, effective January 1, 1983, which allows 10 percent prejudgment interest under certain circumstances for an action brought to recover damages for personal injury).

Here, the court awarded $425,000 in prejudgment interest. It is apparent the court took the time between February 11, 1977 (the date INA's liability for the full penal amount became reasonably clear) and May 11, 1981, a period of 4.25 years (actually 4.2438), and multiplied it by 10 percent of the $1 million penal amount to reach its total interest award of $425,000

and an interest accumulation of $273.97 per day. This was error. The total amount of prejudgment interest should be 7 percent of $1 million ($70,000) multiplied by 4.25 years for a total of $297,500. Accordingly, the judgment should be reduced.

■■■ Finally, the award of attorney's fees was proper (see *Brandt* v. *Superior Court* (1985) 37 Cal.3d 813, 819 [210 Cal.Rptr. 211, 693 P.2d 796]) to the extent they are attributable to efforts to obtain the payments withheld in bad faith. The record does not show the attorney's fees were awarded for any other purpose.

V

The judgment is reduced to $1,582,500 to reflect a proper prejudgment interest of 7 percent per annum instead of 10 percent, and in all other respects is affirmed.

Brown (Gerald), P. J., and Lewis, J., concurred.