[Civ. No. 23650. Third Dist. Nov. 21, 1985.]

GENERAL INSURANCE COMPANY OF AMERICA,
Plaintiff, Cross-defendant and Appellant, v.
MAMMOTH VISTA OWNERS' ASSOCIATION, INC., et al.,
Defendants, Cross-complainants and Respondents.

**[Opinion certified for partial publication.\*]**

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts II through IX.

**COUNSEL**

Perona, Langer, LaTorraca & Beck and Raymond H. Goettsch for Plaintiff, Cross-defendant and Appellant.

Gage & Mazursky, Arnold W. Schwartz and Michael H. Whitehill for Defendants, Cross-complainants and Respondents.

**OPINION**

**CARR, J.**—We approach this appeal with a sense of deja vu as this is the second time this matter has been before us. However, in the instant appeal, the primary issue confronting us is whether a surety bonding company is subject to an action for breach of the covenant of good faith and fair dealing either under the common law or the statutory duties imposed by section 790.03 et seq. of the Insurance Code, the Unfair Practices Act.

Plaintiff General Insurance Company of America (General) was the recipient of a judgment for compensatory and punitive damages in favor of Mammoth Vista Owners' Association, Inc. (Mammoth) in an action on a surety bond for breach of the implied covenant of good faith and fair dealing and violation of the Unfair Practices Act (Ins. Code, § 790 et seq.). On this appeal General contends that a surety is not subject to liability in tort for breach of the implied covenant of good faith and fair dealing or violation of the Unfair Practices Act. In addition, General asserts Mammoth lacked capacity to prosecute its cross-complaint as its corporate status was suspended, Mammoth's action on the bond was barred by the statute of limi-

tations, the court erred in several evidentiary rulings with respect to expert witnesses and other matters, the court erred in prohibiting General from making certain arguments in its closing statement, the court made several instructional errors, Mammoth's attorney committed prejudicial misconduct, Mammoth elected a contract remedy and the court did not sufficiently offset the verdict award by the amount Mammoth received in a prior summary judgment. We shall remand with directions to make certain corrections in the compensatory award. In all other respects, we shall affirm.

FACTS

Mammoth is a nonprofit corporation whose members are owners of lots in Mammoth Vista Unit 2, a planned unit development. East Sierra Development Corporation (East Sierra) was the developer of Mammoth Vista. On October 12, 1972, East Sierra, in preparation for a public offering of lots, entered into an agreement with Mammoth for the construction of recreational facilities within the common area of Mammoth Vista. East Sierra agreed to complete the facilities by October 1, 1973, and to deliver to Mammoth an owner's completion bond in the amount of $38,500, plus a contingency of 10 percent, guaranteeing completion of the facilities. The contract was signed by Thomas Kemp on behalf of both Mammoth and East Sierra. Kemp was a director of Mammoth as well as secretary and general counsel for East Sierra. He prepared and filed the articles of incorporation for Mammoth. When the contract was executed, Mammoth had not commenced doing business.

In accordance with the contract, East Sierra, as principal, and General, as surety, executed a surety bond in favor of Mammoth in the amount of $42,350, conditioned on the faithful completion of the construction of the recreational facilities.[1]

East Sierra did not complete the facilities on schedule and in fact has never completed them.

---

[1]The bond was executed pursuant to the requirements of Business and Professions Code Section 11018.5, subdivision (a)(2)(A), which provides: "With respect to the subdivisions and interests of the type described in section 11004.5, . . . the [real estate] commissioner shall issue a public report if the commissioner finds the following with respect to any such subdivision or interest: . . . [¶] (2) If the condominium or community apartment project, stock cooperative or planned development, or premises or facilities within the common area are not completed prior to issuance of a final subdivision public report on the project, the subdivider shall specify a reasonable date for completion and shall comply with one of the following conditions: [¶] (A) Arranges for lien and completion bond or bonds in an amount and subject to such terms, conditions and coverage as the commissioner may approve to assure completion of the improvements lien free."

Section 11004.5 of the Business and Professions Code encompasses planned unit developments.

At the time established for completion, Mammoth had yet to hold its first meeting of directors, who were owners of lots in Mammoth Vista. Mammoth did hold an organizational meeting in September 1974 and a first meeting of directors in July 1975. At that meeting, the directors discussed the matter of the recreational facilities. They were unaware of the construction contract between Mammoth and East Sierra or the surety bond executed pursuant thereto. The possibility of altering the plans for the facilities was discussed but no agreement was reached.

On July 31, 1975, Patrick Sheehy, an attorney, lot owner and president of Mammoth, wrote to Thomas Kemp expressing confusion over the status of the common area. He asked Kemp if there was any obligation on the part of the developer to comply with specific plans for the common area and requested information on the whereabouts of the "obligating document." Sheehy further inquired if there was a bond insuring the developer's performance and requested a copy. Kemp responded with a letter that he had "not been able to find any indication that such [recreational] improvements [for the common area] were bonded." As for plans and specifications, Kemp suggested that Sheehy contact Bill Allen or Doug Perry of East Sierra.

In some manner not disclosed by the record, Sheehy learned of the bond and, in August 1975, requested and received a copy from General. On September 26, 1975, Sheehy sent a letter to General advising it that the recreational facilities for the common area had not been completed as required. He asked General to "not release the bond, but instead forward us all information which will allow us to call upon you to deliver the monies to the Mammoth Vista Homeowners' Association, . . ."

General did not send any information or acknowledge the legitimacy of Mammoth's claim, but a Mr. Christos responded by letter, stating, "As you undoubtedly know the obligation of the surety is contingent upon the liability of its principal and the primary duty of discharging the claim you make rests with our principal." Christos stated that he was forwarding a copy of Sheehy's letter to East Sierra with a request it "take whatever action is required," and that the letter was not to be construed as a recognition or acknowledgment of the propriety of Mammoth's claim. During the next two years, General took no other action on Mammoth's claim.

By at least March 1977, General knew East Sierra had not completed the work and was financially unable to do so. During that year, the Department of Real Estate informed General the work had not been completed and that Mammoth may have to come against the bond. On August 12, 1977, N. D. Smith, an employee of General, informed his home office that East Sierra

was financially unable to complete the facilities and that General might have to advance the funds to complete the work.

On August 15, 1977, Myron Blumberg, representing Mammoth, informed General for the second time, through Smith, that East Sierra was in default on the construction of the facilities and made a demand for the penal sum of the bond or completion of the work. General again took no action on Mammoth's claim.

Settlement negotiations ensued between Mammoth and East Sierra. On August 18, Smith informed his home office that it would be agreeable to "cash out" for $8,000 to $10,000. In September 1977, Bill Allen of East Sierra informed Smith that there were only four active members of the five-member Mammoth board as one member had quit, and the board was split two to two on whether to settle for $10,000. Allen stated he would "push" a third member, Michael Henry, to agree to the settlement. Smith promised to put up the funds. Smith informed his home office that Allen was continuing negotiations with Mammoth in the hope of convincing a "wavering" member of the board to accept settlement for $10,000, as the board was "unfortunately" evenly split on whether to settle. Smith stated he promised to furnish the funds on behalf of General if settlement was reached.

On November 7, 1977, Smith informed his home office that Henry indicated a willingness to accept the difference between what East Sierra had actually spent on construction of the facilities and the penal sum of the bond, Henry being under the mistaken impression that this was the amount East Sierra was committed to spend on the project. Smith stated, " 'I believe that it may not be the best way to determine the remaining exposure on the bond, but if it works to get a settlement in the range we think it should be, then why not.' "

No settlement was reached. Shortly thereafter, Roy Saari, an attorney and Mammoth Vista lot owner, was approached by Pete Yorkey on behalf of the Mammoth board and requested to look into the matter of the bond. On March 14, 1978, Saari sent a letter to General informing it for the *third* time that East Sierra had failed to complete the recreational facilities and requested whatever forms were necessary to make a claim on the bond. Smith responded by suggesting Saari make telephone contact and he did so.

On April 3, 1978, a meeting was held in the Los Angeles office of East Sierra, attended by Smith, Allen, and Henry, Yorkey and Saari on behalf of Mammoth. The Mammoth representatives presented the plans for the recreational facilities and expressed the desire that they be completed. How-

ever, no one knew the cost to complete the facilities. The parties agreed that Mammoth and East Sierra would obtain estimates of the cost of completion and they would meet again to resolve the matter.

Yorkey, a building contractor, examined the plans and arrived at an estimate of $45,270 to complete the facilities. In July or August 1978, the parties met again. The Mammoth representatives presented Yorkey's cost estimate and Allen agreed it would cost approximately that much to complete the facilities. Smith then stated for the first time that East Sierra was insolvent and that the statute of limitations had run on Mammoth's claim. He offered to settle Mammoth's claim for $20,000, which was rejected by Mammoth, the representatives of which had no authority at that time to accept any offer.

On August 30, 1978, Smith wrote to Saari reiterating General's position on the statute of limitations, and pointing out that the original contract had provided for construction to be completed by October 1, 1973, which date would commence the running of the statute. Smith concluded "'since litigation is known to be expensive, we would be very happy to discuss with you a reasonable compromise of this claim.'" Saari was unaware of the existence of the contract and asked Smith for a copy. Thereafter, Smith sent a memo to his home office recommending that General attempt to negotiate a settlement for $20,000. Mammoth refused to settle and reiterated its claim for the full penal sum of the bond.

On November 13, 1978, General filed a complaint praying for a declaration that Mammoth's claim on the surety bond was barred by the statute of limitations. By answer, Mammoth prayed for a declaration that it was not barred by the statute of limitations and that General is indebted to it for the full penal sum of the bond plus interest from the date of Mammoth's demand under the bond.

Mammoth also filed a cross-complaint against General alleging causes of action for (1) declaratory relief as to the obligations under the bond; (2) tortious breach of the implied covenant of good faith and fair dealing; (3) unfair claims settlement practices under the Unfair Practices Act (Ins. Code, § 790.03, subd. (h))[2]; (4) intentional interference with a protected property interest; and (5) breach of fiduciary duties. Punitive damages were sought.

---

[2]Mammoth specifically alleged violation of the following provisions of Insurance Code section 790.03, subdivision (h):

Subdivision (h)(2): "Failing to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies."

Subdivision (h)(3): "Failing to adopt and implement reasonable standards for the prompt

General demurred and moved to strike Mammoth's cross-complaint. The court struck the first cause of action and sustained the demurrer without leave to amend as to the fourth and fifth causes of action. The court over-ruled the demurrer as to the second and third causes of action.

Mammoth moved for judgment on the pleadings, or in the alternative for summary judgment, as to General's complaint. General cross-moved for summary judgment or summary adjudication of issues on the ground the four-year statute of limitations of Code of Civil Procedure section 337, subdivision 1, barred Mammoth from bringing an action to recover on the bond.[3]

On December 12, 1980, the trial court issued an order specifying certain issues to be without controversy and granting Mammoth's motion for sum-mary judgment. The court found that the statute of limitations did not com-mence on October 1, 1973; that East Sierra failed to complete construction of the recreational facilities in accordance with the contract; and that Gen-eral was obligated to Mammoth for the full penal sum of the bond in the amount of $42,350.

In January 1981, General filed a motion for entry of judgment in the amount of $42,350, plus interest from November 13, 1978, the date General filed its complaint. The court granted the motion and on March 11, 1981, entered judgment that Mammoth recover $42,350, plus $6,673.13 in inter-est accruing from November 13, 1978.

General did not appeal and tendered the judgment amount to Mammoth, which Mammoth refused to accept. General moved for an order to deposit the judgment amount plus interest ($49,211.13) with the clerk of the court pending further disposition and for an order of entry of satisfaction of judg-

---

investigation and processing of claims arising under insurance policies."

Subdivision (h)(5): "Not attempting in good faith to effectuate prompt, fair, and equitable settlements of claims in which liability has become reasonably clear."

Subdivision (h)(6): "Compelling insureds to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately re-covered in actions brought by such insureds, when such insureds have made claims for amounts reasonably similar to the amounts ultimately recovered."

Subdivision (h)(11): "Delaying the investigation or payment of claims by requiring an insured, claimant, or the physician of either, to submit a preliminary claim report, and then requiring the subsequent submission of formal proof of loss forms, both of which submis-sions contain substantially the same information."

Subdivision (h)(15): "Misleading a claimant as to the applicable statute of limitations."

[3]Code of Civil Procedure, section 337, subdivision 1, establishes a four-year statute of limitations for "[a]n action upon any contract, obligation or liability founded upon an in-strument in writing, . . ."

ment. The court granted the motion for deposit and ordered $49,211.13 be deposited with the clerk of the court on March 31, 1981.

Mammoth appealed from the summary judgment entered on March 11, contending, inter alia, that the court incorrectly determined the date from which interest on the judgment should be computed. While the appeal was pending, Mammoth filed a memorandum in opposition to entry of satisfaction of judgment on the ground the judgment was not final. On November 17, 1981, the court issued an order for entry of satisfaction of judgment, without prejudice to Mammoth's remaining causes of action under its cross-complaint.

We treated Mammoth's appeal as a petition for writ of mandate and in an opinion that was final on March 21, 1983, held the proper date from which interest should be computed is the date of Mammoth's first demand under the bond.[4] We issued a peremptory writ of mandate directing the trial court to vacate that part of the summary judgment fixing the date from which interest accrued and to undertake further proceedings to determine the correct date from which interest should be computed as well as the remaining issues on the cross-complaint.

On September 2, 1983, Mammoth moved for an order releasing to it the funds deposited by General with the clerk of the court. The court granted the motion and ordered the distribution to Mammoth of $49,211.13, plus all accrued interest thereon.

On the eve of trial, on the other issues, General moved to strike Mammoth's pleadings and dismiss its cross-complaint on the ground Mammoth lacked capacity to maintain or defend the action because its corporate status was suspended. (See Rev. & Tax. Code, §§ 23301, 23301.5, 23302.) A copy of a certificate of suspension attached to the motion showed Mammoth's corporate status was suspended by the Secretary of State on August 1, 1974. The court denied the motion to give Mammoth an opportunity to revive its corporate status.

General further moved for judgment on the pleadings on the ground there is no recognized tort action under a surety bond for breach of the implied covenant of good faith and fair dealing or violation of the Unfair Practices Act. The court denied the motion.

---

[4]*General Insurance Company of America* v. *Mammoth Vista Owners' Association, Inc.* (Jan. 19, 1983, 3 Civ. 20704). We take judicial notice of this opinion. (Evid. Code, §§ 452, subd. (d), 459.)

Trial finally commenced on Mammoth's cross-complaint and on October 28, 1983, the jury found for plaintiff, awarding compensatory damages in the amount of $120,500 and punitive damages in the amount of $150,000. The jury specially found that Mammoth made its first demand under the bond on September 26, 1975, the date of Sheehy's letter. On November 29, General moved for judgment notwithstanding the verdict on grounds that Mammoth had not revived its corporate status prior to judgment; that the verdict award should be reduced by the amount Mammoth received under the summary judgment; that Mammoth was precluded from receiving punitive damages by election of a contract remedy; and that the judgment should reflect that Mammoth is not entitled to attorney fees.

In opposition, Mammoth submitted documents showing that as of December 1, 1983, it was in good legal standing and authorized to exercise all its corporate powers, rights, and privileges. Mammoth conceded General was entitled to an offset of $49,211.13. General, however, argued it was entitled to an offset of $62,573.10, the amount Mammoth actually received from the superior court trust fund, representing $49,211.13 plus interest from the date General deposited the money with the court to the date it was distributed to Mammoth.

The court granted the motion for judgment notwithstanding the verdict as to reduction of the verdict award, but reduced the award only by $49,211.13, for net compensatory damages of $70,788.87. It also granted the motion as to attorney fees. In all other respects, the court denied the motion. General timely filed notice of appeal.

I

The leading issue submitted by General is that a surety is not subject to liability in tort for breach of the implied covenant of good faith and fair dealing or for breach of statutory duties under the Unfair Practices Act. (Ins. Code, § 790.03.) For reasons hereafter elucidated, we do not agree.

We note initially it is unnecessary for us to decide as to each theory whether the obligee under a surety bond may sustain a tort action against the surety. ■ The actionable wrong contained in Insurance Code section 790.03, subdivision (h), is merely a codification of the tort of breach of the implied covenant of good faith and fair dealing as applied to insurance. (*Richardson* v. *GAB Business Services, Inc.* (1984) 161 Cal.App.3d 519, 524 [207 Cal.Rptr. 519].) "Section 790.03 merely enumerates those practices which are actionable and extends the cause of action to third party

claimants, . . ." (*Ibid.;* see *Royal Globe Ins. Co.* v. *Superior Court* (1979) 23 Cal.3d 880, 888 [153 Cal.Rptr. 842, 592 P.2d 329].)

■ Under common law, every insurer has an implied-in-law duty to act fairly and in good faith in handling the claim of an insured. (*Gruenburg* v. *Aetna Ins. Co.* (1973) 9 Cal.3d 566, 573-574 [108 Cal.Rptr. 480, 510 P.2d 1032].) Tortious violation of that duty may occur in several ways, including failure "without proper cause, to compensate its insured for a loss covered by the policy" (*Gruenberg,* at p. 574); failure to properly investigate a claim (*Egan* v. *Mutual of Omaha Ins. Co.* (1979) 24 Cal.3d 809, 819 [169 Cal.Rptr. 691, 620 P.2d 141]); and failure to accept a reasonable settlement within policy limits (*Comunale* v. *Traders & General Ins. Co.* (1958) 50 Cal.2d 654, 661 [328 P.2d 198, 68 A.L.R.2d 883]). In establishing "unfair claims settlement practices," subdivision (h) of section 790.03 sets forth standards of conduct substantially similar to those at common law. As examples, an insurer violates the statute by "[f]ailing to acknowledge and act reasonably promptly upon communications with respect to claims . . ." (subd. (h)(2)); "[f]ailing to adopt and implement reasonable standards for the prompt investigation and processing of claims . . ." (subd. (h)(3)); and "[n]ot attempting in good faith to effectuate prompt, fair, and equitable settlements of claims in which liability has become reasonably clear." (Subd. (h)(5).) ■ ■ ■ ■ ■ Accordingly, we shall only consider the question of whether an action may be brought against a surety for violation of the Unfair Practices Act.[5]

■ Insurance Code section 790.03 is part of article 6.5 (commencing with § 790) of part 2 of division 1 of the Insurance Code. The purpose of the article "is to regulate trade practices in the *business of insurance* . . . by defining . . . all such practices in this State which constitute unfair methods of competition or unfair or deceptive acts or practices and by prohibiting the trade practices so defined or determined." (Ins. Code, § 790; italics added.) The statute applies to "all . . . persons engaged in the business of insurance" (Ins. Code, § 790.01) and section 790.03 defines those acts prohibited as "unfair methods of competition and unfair and deceptive acts or practices in the *business of insurance.*" (Italics added.)

Insurance Code section 22 defines "Insurance" in broad terms as "a contract whereby one undertakes to indemnify another against loss, damage, or

---

[5]We are also guided by the rule that where it is not clear upon which of two or more theories pled the court based its judgment and each theory is supported by the same allegations, the appellate court may disregard particular theories and affirm the judgment on any theory which is supported by the evidence. (*Crogan* v. *Metz* (1956) 47 Cal.2d 398, 403 [303 P.2d 1029]; *Gilman* v. *Nemetz* (1962) 203 Cal.App.2d 81, 94 [21 Cal.Rptr. 317].)

liability arising from a contingent or unknown event." One who undertakes to indemnify another by insurance is the "insurer" and the person indemnified is the "insured." (Ins. Code, § 23.) "*All* insurance in this State is governed by provisions of this code." (Ins. Code, § 41; italics added.) "Surety" is specifically included among the "classes" of "[i]nsurance in this state . . . ." (Ins. Code, § 100, subd. (5).) "Surety insurance includes: [¶] (1) The guaranteeing of behavior of persons and *the guaranteeing of performance of contracts* (including executing or guaranteeing bonds and undertakings required or permitted in all actions or proceedings or by law allowed), other than insurance policies and other than for payments secured by liens of mortgages." (Ins. Code, § 105, italics added.)

By plain and explicit language, the Legislature made suretyship a "class" of insurance subject to regulation under the code. For the purposes of the Insurance Code, one who issues surety bonds is in "the business of insurance" and subject to the provisions prohibiting unfair and deceptive practices.

General contends that the Insurance Code definition of suretyship as a class of insurance is not dispositive of whether suretyship *is* insurance. ▪ ▪ ▪ ▪ General emphasizes the traditional differences between suretyship and typical liability insurance. We recognize liability insurance is not identical in every respect with suretyship.[6] But we are not concerned with the differences between suretyship and liability insurance. ▪ ▪ ▪ ▪ ▪ We are concerned with whether the Legislature included suretyship among the classes of businesses it intended to regulate under the Insurance Code. It clearly did so.[7]

▪ The subjection of surety insurance to the provisions of Insurance Code section 790.03, subdivision (h), is consistent with the purpose of de-

---

[6]The essential distinction between the two is that the promisor in an indemnity contract undertakes to protect the promisee against loss or damage through liability on the part of the promisee to a third person while the surety undertakes to protect the promisee against loss or damage through the failure of a third person to fulfill its obligation to the promisee. (*Leatherby Ins. Co.* v. *City of Tustin* (1977) 76 Cal.App.3d 678, 687 [143 Cal.Rptr. 153]; for other differences, see Conners, Cal. Surety and Fidelity Bond Practice (Cont.Ed.Bar 1969) pp. 6-7.)

[7]The fact that there are differences between suretyship and liability insurance may have some persuasive power in other aspects, but General has failed to demonstrate why these differences should preclude a surety from being subject to suit for unfair practices in the same manner as a liability insurer. Construction completion bonds are generally considered contracts of insurance and have specifically been made subject to the rule that insurance contracts are to be strictly construed against the insurer in order to achieve the object of coverage for the losses to which the contract relates. (*Pacific Employers Ins. Co.* v. *City of Berkeley* (1984) 158 Cal.App.3d 145, 152-153 and fn. 3 [204 Cal.Rptr. 387].)

terring unfair and deceptive practices in the business of insurance. As demonstrated by this case, obligees under surety contracts are as susceptible to deceptive and unfair claims settlement practices as insurers and claimants under liability insurance contracts.

■■ A high standard of good faith and fair dealing is particularly appropriate for construction completion bonds under Business and Professions Code section 11018.5. (See fn. 1, *ante*.) Section 11018.5 is part of the subdivided lands act (Bus. & Prof. Code, § 11000 et seq.; Cal. Admin. Code, tit. 10, § 2790 et seq.), under which the Real Estate Commissioner has authority over planned developments, community apartment complexes, condominiums and stock cooperatives. (Bus. & Prof. Code, §§ 11000, 11004.5.) The purpose is to prevent fraud and misrepresentation in the marketing of subdivided parcels by requiring disclosure of the financial risks and benefits of a transaction to proposed buyers and lessees. (*California Coastal Com.* v. *Quanta Investment Corp.* (1980) 113 Cal.App.3d 579, 589 [170 Cal.Rptr. 263].) To this end, the Real Estate Commissioner issues public reports based on disclosures made by subdividers in connection with parcels offered for sale or lease. (Bus. & Prof. Code, §§ 11010-11018.1.) No person may sell or lease any subdivided parcel without first obtaining a public report. (Bus. & Prof. Code, § 11018.2.) When subdividers represent that a development will contain common area facilities, section 11018.5 requires that the completion of any common area facilities not completed prior to issuance of the final report be assured by one of several optional means, including a completion bond. The bond in this case serves an important public purpose by protecting the expectations of buyers and lessees of subdivided property.

■ General relies on a 1919 First Appellate District case for the principle that statutes regulating insurance are not applicable to surety contracts. In *James Eva Estate* v. *Oakland B. & M. Co.* (1919) 40 Cal.App. 515 [181 P. 415], a lessor brought an action for collection of back rent. Judgment was entered against the sureties. One of the sureties appealed, contending the bond at issue was void as not complying with the provisions of the Political Code governing insurance.[8] The court held surety insurance, defined in former Political Code section 594, was not included within that section of the code which nullified all contracts of insurance issued without full compliance with the laws of this state (at p. 517) and concluded, "In our opinion the code sections relied upon are intended to apply exclusively

---

[8]Prior to the adoption of the Insurance Code in 1935, the provisions governing insurance were contained in the Political Code and Civil Code. (See 42 West's Annot. Ins. Code (1972 ed.) pp. XLI-XLIV.)

to the conduct of the business of insurance as such, and their provisions cannot be stretched to cover the case of a single contract of guaranty such as the one involved in this action." (*Ibid.*)

*James Eva Estate* is inapposite. The provisions of the former Political Code are not identical to those of the Insurance Code, nor was the court confronted with the issue confronting this court, whether surety insurance is subject to section 790.03. This is easily explained as that section did not exist in 1919. Nor did the court analyze the reasons for its holding. We find that case unpersuasive and at most a holding limited to the facts of the case, which involved a brewing and malting company issuing a single bond, not an insurance company which engaged in the business of surety insurance.

General further contends a surety cannot be held to answer for damages in tort because its liability is limited to the terms of the contract. The cases upon which General relies do not support this contention.

*U.S. Leasing Corp.* v. *duPont* (1968) 69 Cal.2d 275 [70 Cal.Rptr. 393, 444 P.2d 65], arose out of an action for declaratory relief to establish a surety's liability under a bond executed in connection with a lease, after the lessee-principal allegedly breached the lease agreement. The court determined first that the principal had not yet breached the lease. Obviously, the surety could not be held to answer for a breach of an obligation which had not yet occurred. A second issue was whether the surety, upon breach by the lessee, could be held liable for the "economic loss" occasioned by the lessee's breach or only for unpaid rent due under the lease. The court concluded the surety contract did not guarantee against "economic loss" but only the payment of the rent specified in the lease; therefore, the surety could not be held liable for "economic loss." (69 Cal.2d at pp. 286-290.)

In holding a surety cannot be held liable beyond the express terms of its contract, the court merely stated the principle that the surety's obligation to cover losses *occasioned by the breach of the principal* is limited to those losses it expressly agreed to guarantee. *U.S. Leasing* does not hold a surety cannot be held liable in tort for its *independent* violation of statutory or common law duties in the *handling* of a claim under the bond. (*Gruenberg* v. *Aetna Ins. Co., supra,* 9 Cal.3d at p. 574.) ■ Under common law, an insurer who breaches the duty of good faith and fair dealing may be held liable in tort *beyond* the limits of the policy. (*Id.,* at p. 573.)

■ *Kane* v. *Mendenhall* (1936) 5 Cal.2d 749 [56 P.2d 498], is not remotely on point. There, judgment was rendered against a real estate broker $2,500 in damages for fraud and $2,000 in punitive damages; and

against a surety on the real estate broker's bond for $2,000 general damages. The issue on appeal was whether the plaintiff could maintain a joint action in superior court against the principal for the full amount of damages occasioned by the fraud of the principal and against the surety for the penal sum of the bond. The plaintiff brought no tort action against the surety and the court was not confronted with the issue before us.[9]

Nor is General's position supported by Civil Code section 2809, which provides: "The obligation of a surety must be neither larger in amount nor in other respects more burdensome than that of the principal; and if *in its terms* exceeds it, it is reducible in proportion to the principal obligation." (Italics added.) ▆▆▆ We interpret this section as expressing only the rule enunciated in *U.S. Leasing* that the surety's *express contractual* liability may not exceed that of the principal. Section 2809 does not purport to restrict the surety's *independent* liability for violation of duties imposed by law.[10]

▆▆▆ We conclude an obligee under a surety bond may bring an action against its surety for engaging in unfair claims settlement practices in violation of Insurance Code section 790.03, subdivision (h). The evidence in the present case amply supports the judgment under this theory.

II-IX*

. . . . . . . . . . . . . . . . . . . . . . . .

X

Finally, General contends (1) Mammoth is not entitled to punitive damages as it elected a contract remedy, and (2) the court did not offset the verdict award by a sufficient amount.

---

[9]The only relevant case upon which General relies is a Ninth Circuit case, *Amfac Mtg. Corp.* v. *Arizona Mall of Tempe, Inc.* (9th Cir. 1978) 583 F.2d 426. In that case, the court held that under *Arizona* law there is no cause of action in tort for breach of the obligation of good faith by a surety. In dicta, the court stated, "Even California law . . . holds that a surety cannot be held beyond the express terms of the contract," citing *U.S. Leasing Corp.* (*Id.*, at p. 435.) With due respect to the Ninth Circuit Court of Appeals, it misinterprets the applicability of *U.S. Leasing* to a tort action.

[10]General also relies on Code of Civil Procedure section 996.470, subdivision (a), which provides: "Notwithstanding any other statute, the aggregate liability of a surety to all persons for all breaches of the condition of a bond is limited to the amount of the bond. Except as otherwise provided by statute, the liability of the principal is not limited to the amount of the bond." This section does not apply to bonds issued before January 1, 1983. (Code Civ. Proc., § 995.020, subd. (b)(1).) In any event, we interpret it in the same manner as Civil Code section 2809. It is expressly limited to breaches of the *condition* of the bond.

*See footnote, *ante,* page 810.

*Election of Remedies*

▆▆▆ General claims Mammoth manifested an intent to elect a contract remedy by (1) praying in answer to General's complaint for a declaration of General's indebtedness to it for the penal sum of the bond; (2) moving for summary judgment on General's complaint; (3) appealing the summary judgment in order to obtain interest from the date of first demand under the bond; (4) accepting the monies deposited with the court; and (5) seeking a jury determination of the date of its first demand under the bond.

▆▆▆ "Broadly speaking, election of remedies is the act of choosing between two or more concurrent but inconsistent remedies based upon the same set of facts. Ordinarily, a plaintiff need not elect, and cannot be compelled to elect, between inconsistent remedies during the course of trial prior to judgment. [Citations.]" (*Roam* v. *Koop* (1974) 41 Cal.App.3d 1035, 1039 [116 Cal.Rptr. 539].) ▆▆▆ "'The doctrine of election of remedies is but a specific application of the doctrine of equitable estoppel. [Citations.] The doctrine rests on the rationale that when plaintiff has pursued a remedy which is inconsistent with an alternative remedy and thereby causes the defendant substantial prejudice, plaintiff should be estopped from pursuing the alternative remedy.' [Citation.] [¶] ▆▆▆ Courts and commentators have long recognized the harshness of the election of remedies doctrine and have for some time looked upon it with disfavor. [Citations.] To mitigate the doctrine's effects, courts over the years have devised various ways of narrowing its application." (*Baker* v. *Superior Court* (1983) 150 Cal.App.3d 140, 145 [197 Cal.Rptr. 480].)

The doctrine applies only when the plaintiff seeks inconsistent remedies in causes of action based on the same set of facts. Election of remedies does not preclude a plaintiff from pursuing two causes of action, as breach of contract and fraud, where each action arose out of *different obligations and different operative facts.* (*Baker* v. *Superior Court, supra,* 150 Cal.App.3d at pp. 145-146; *Glendale Fed. Sav. & Loan Assn.* v. *Marina View Heights Dev. Co.* (1977) 66 Cal.App.3d 101, 137 [135 Cal.Rptr. 802].) In answer to General's complaint, Mammoth sought a declaration of General's obligation to it under the bond, an obligation which had its genesis in the execution of the surety contract and became fixed immediately upon the default of East Sierra in 1973. Mammoth's cross-complaint was based upon General's statutory and common law duties to deal with Mammoth fairly and in good faith, the breach of which occurred over the course of several years *after* General's contractual obligation became fixed and due. Mammoth's actions arose out of separate obligations and separate operative facts. Mam-

moth did not make an election of remedies but pursued two separate causes of action to successful completion.

*Reduction of the Compensatory Award*

After summary judgment in favor of Mammoth, General tendered $49,211.13, representing the penal sum of the bond plus interest from the date General filed its complaint. Mammoth refused the offer. General then deposited this amount with the clerk of the court and moved for entry of satisfaction of judgment. Mammoth appealed from the summary judgment in order to receive interest from the date of its first demand under the bond. When Mammoth finally received the money after prevailing on appeal, $13,561.97 in interest had accumulated, giving it a total of $62,573.10. At trial, the court refused to permit evidence that Mammoth received this amount and ultimately reduced the verdict award by only $49,211.13. **(14a)** General contends it is entitled to an additional reduction of $13,561.97 in interest. This contention has merit.

Generally, where a prevailing party appeals on the ground it is entitled to a larger recovery and the appellate court agrees and modifies the recovery upward, the new sum draws interest from the date of entry of the original judgment, not from the date of the new judgment. (*Snapp* v. *State Farm Fire & Cas. Co.* (1964) 60 Cal.2d 816, 817-819 [36 Cal.Rptr. 612, 388 P.2d 884]; *Stockton Theatres, Inc.* v. *Palermo* (1961) 55 Cal.2d 439, 442-443 [11 Cal.Rptr. 580, 360 P.2d 76].) However, a tender of the full amount of the judgment by the losing party pending appeal by the prevailing party, when refused, stops the running of interest on the judgment. (*Ferrea* v. *Tubbs* (1899) 125 Cal. 687, 689-692 [58 P. 308]; *Beeler* v. *American Trust Co.* (1946) 28 Cal.2d 435, 438 [170 P.2d 439]; Civ. Code, § 1504.)

 ██ ██ Interest on the summary judgment award stopped running when General tendered the amount of the award to Mammoth and Mammoth refused to accept it.[16] Mammoth was therefore not entitled, as an incident to the summary judgment, to the interest which accumulated while the money was on deposit with the court. Accordingly, the amount Mammoth actually received in interest must be deducted from the jury award.

---

[16]Mammoth's right to appeal would not have been prejudiced had it accepted General's tender. By that time, General did not contest Mammoth's right to the money; it made every effort to compel Mammoth to accept it. Where the respondent does not contest the appellant's right to the amount given by the judgment, appellant's acceptance of it will not preclude an appeal based upon a claim he was entitled to a greater amount. (*Estate of Hubbell* (1932) 216 Cal. 574, 577 [15 P.2d 503]; 6 Witkin, Cal. Procedure (1971 ed.) § 138, p. 4134.)

■ We note finally that the judgment should provide for prejudgment interest on the penal sum of the bond from the date Mammoth made its first demand. In accordance with the writ of mandate issued by this court, this issue was put before the jury and it determined the date Mammoth made its first demand under the bond was September 26, 1975. The final judgment does not account for interest on the penal sum from this date. We shall remand and direct that it do so.

## DISPOSITION

The judgment with respect to the amount of compensatory damages is reversed and remanded to the trial court with instructions to subtract from the verdict award the total amount actually received by Mammoth under the summary judgment award, including interest which accumulated while on deposit with the superior court. The court is further directed to determine and add to the award an amount equal to interest on the penal sum of the bond from September 26, 1975, to the date General tendered the penal sum to Mammoth, less interest which Mammoth has already received. In all other respects, the judgment is affirmed.

Puglia, P. J., and Sims, J., concurred.