755 F.Supp. 906 (1991)
The UNITED STATES, for the Benefit and Use of EHMCKE SHEET METAL WORKS, a California corporation, Plaintiff,
v.
WAUSAU INSURANCE COMPANIES, a Wisconsin corporation, and American Pacific Roofing Company, Inc., a California corporation, Defendants.
No. Civ. S-89-1704-DFL EM.
United States District Court, E.D. California, Sacramento Division.
January 25, 1991.
*907 Michael Van Dyke, Gray, Cary, Ames & Frye, San Diego, Cal., for use-plaintiff W.G. Ehmcke Sheet Metal Works.
Dennis W. Richardson, Greve, Clifford, Diepenbrock & Paras, Sacramento, Cal., for defendant Employers Ins. of Wausau.
R. Timothy Ireland, Corona, Belistreri & Ramseger, San Diego, Cal., for defendant American Pacific Roofing Co.
G. Wayne Murphy, Anderson, Mc Pharlin & Connors, Los Angeles, Cal., for Merchants Bonding Co.

ORDER
LEVI, District Judge.

BACKGROUND
This is an action brought by Ehmcke Sheet Metal Works ("Ehmcke"), a subcontractor on a federal government construction project, against American Pacific Roofing Company, Inc. ("APR"), the prime contractor on the project and against APR's surety on the contract, Wausau Insurance Companies ("Wausau"). In its original complaint in this action, filed August 24, 1989, Ehmcke sued APR for breach of contract and sued Wausau both on the surety bond and for breach of the covenant of good faith and fair dealing. This court has subject matter jurisdiction because the suit against Wausau on the surety bond is authorized by the Miller Act, 40 U.S.C. § 270b(a).[1]
On February 9, 1990, after Wausau filed a motion to dismiss, Ehmcke stipulated to the dismissal without prejudice of its claim against Wausau for breach of the covenant *908 of good faith and fair dealing. APR answered and counter-claimed against Ehmcke, and its surety, Merchants Bonding Company on December 27, 1990. Wausau answered on January 26, 1990. The discovery deadline was set for November 14, 1990, but was extended by stipulation of all the parties to December 14, 1990.
Ehmcke now moves under Fed.R.Civ.P. 15 for leave to amend its complaint to assert three additional claims:
(1) To reassert the claim for breach of the covenant of good faith and fair dealing against Wausau,
(2) To assert a fraud claim against APR, and
(3) To assert additional damages for breach of contract against APR for delay and lost efficiency.

DISCUSSION

I. Standards Governing Leave to Amend.

The standards governing the grant of leave to amend are found in Fed.R. of Civ.Proc. 15(a):
A party may amend the party's pleading once as a matter of course ... otherwise a party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires.
Amendments are liberally allowed, within the discretion of the court, although that discretion is not unlimited. Jordan v. County of Los Angeles, 669 F.2d 1311, 1324 (9th Cir.), rev'd on other grounds, 459 U.S. 810, 103 S.Ct. 35, 74 L.Ed.2d 48 (1982). A court may deny leave to amend because of undue delay, bad faith, undue prejudice to the opposing party, or futility of the proposed amendment. Foman v. Davis, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962). The most important of these factors is the prejudice to the opposing party. Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 330, 91 S.Ct. 795, 802, 28 L.Ed.2d 77 (1971); Hurn v. Retirement Fund Trust of Plumbing, Heating and Piping Industry of So. Calif., 648 F.2d 1252, 1254 (9th Cir.1981) (permitting two year delay), quoting Howey v. United States, 481 F.2d 1187, 1190-91 (9th Cir.1973) (permitting five year delay). When the question turns on the possible futility of the amendment, the issue takes on the characteristics of a motion to dismiss. See Moore v. Kayport Package Exp., Inc., 885 F.2d 531, 538 (9th Cir.1989); Rutman Wine Co. v. E. & J. Gallo Winery, 829 F.2d 729 (9th Cir.1987) (court may deny leave to amend on the basis that the proposed amendment will be futile).

II. Can a Surety be Sued by a Subcontractor for Breach of the Covenant of Good Faith?

The court will first address Ehmcke's effort to reassert its state law cause of action against Wausau for breach of the covenant of good faith and fair dealing. Wausau challenges this portion of Ehmcke's motion arguing primarily that the amendment would be futile, because California law does not recognize such a cause of action by a subcontractor against a surety. Wausau brought a motion to dismiss this same claim in Ehmcke's original complaint, based on Moradi-Shalal v. Fireman's Fund Insurance Companies, 46 Cal.3d 287, 250 Cal.Rptr. 116, 758 P.2d 58 (1988). Ehmcke filed a statement of non-opposition to dismissal without prejudice. Now, nine months later, plaintiff requests leave to reassert this claim.

A. The Miller Act
This lawsuit is based on the Miller Act which requires a contractor on a federal construction project to furnish a payment bond of a statutorily specified amount to secure payment to all suppliers of labor and material. 40 U.S.C. § 270a(a)(2). By statute, the surety's payment bond must run to the benefit of the United States, and subcontractors are permitted to sue the surety on the bond in federal court in the name of the United States. 40 U.S.C. §§ 270a(a), 270b(b). Suppliers of material on construction projects ordinarily acquire a mechanic's lien on the real property involved to secure payment. Because a mechanic's lien cannot attach to federal property, *909 the Miller Act's bond requirement was designed to substitute for this common law remedy. See F.D. Rich Co. v. U.S. ex rel. Industrial Lumber Co., 417 U.S. 116, 122, 94 S.Ct. 2157, 2161, 40 L.Ed.2d 703 (1974); U.S. ex rel. Martin Steel Constructors, Inc. v. Avanti Constructors, Inc., 750 F.2d 759, 761 (9th Cir.1984), cert. denied, 474 U.S. 817, 106 S.Ct. 60, 88 L.Ed.2d 49 (1985).
In this case, to comply with the Miller Act, APR entered into a suretyship agreement with Wausau. Ehmcke now seeks to sue on the bond under the Miller Act  which it plainly may do  but also seeks to add a state law cause of action against Wausau for breach of the covenant of good faith and fair dealing.[2]
As an initial matter, the court notes that such a state law claim is not preempted by the remedy on the bond provided in the Miller Act. The Ninth Circuit has ruled that the Miller Act does not exclude state law claims against sureties for conduct relating to the performance of obligations arising out of Miller Act bonds. K-W Industries v. National Sur. Corp., 855 F.2d 640 (1988). In K-W Industries, the Montana Supreme Court determined, on a certified question, that the Montana unfair insurance claims practices code provision subjects sureties to liability to subcontractors for unfair insurance claims practices in amounts exceeding the amount of the bond. The Ninth Circuit then determined that Congress did not intend the Miller Act to preempt state insurance laws: "The Miller Act simply supplies the equivalent of a mechanic's lien; it does not supplant any other remedies the supplier may have against any party involved in a federal construction project." Id. at 643.
Thus, if California law permits an action for breach of the covenant of good faith and fair dealing against a surety by a party who has not contracted for the surety bond, the Miller Act will not preempt that action.

B. Does California Common Law Permit a Subcontractor to Sue the Prime Contractor's Surety for Breach of the Covenant of Good Faith and Fair Dealing?

California substantive law determines whether a subcontractor such as Ehmcke may maintain a tort claim for breach of the covenant of good faith and fair dealing against the prime contractor's surety. See K-W Industries, 855 F.2d at 641. This is an issue of first impression in the California courts, and it is not obvious how the California Supreme Court would resolve the issue.[3] In such uncertainty "a federal court must use its own best judgment in predicting" what the California Supreme Court would decide. See Amfac Mortgage Corp. v. Arizona Mall of Tempe, Inc., 583 F.2d 426, 434-5 (9th Cir.1978).[4]
*910 The starting point for analysis of this potential cause of action must be the California Supreme Court's recent decision in Moradi-Shalal v. Fireman's Fund Insurance Companies, 46 Cal.3d 287, 250 Cal. Rptr. 116, 758 P.2d 58 (1988). In Moradi-Shalal, the California Supreme Court overruled its earlier decision in Royal Globe Ins. Co. v. Superior Court, 23 Cal.3d 880, 153 Cal.Rptr. 842, 592 P.2d 329 (1979). Royal Globe had found that the California Unfair Practices Act § 790.03(h) permitted a third party claimant to sue an insurer for violation of a statutory obligation of fair dealing. In overruling Royal Globe, the Court in Moradi-Shalal noted and relied upon a number of adverse consequences that had flowed from Royal Globe's extension of a cause of action to those not in privity of contract with the insurer. First, the court noted that the rule in Royal Globe "promotes multiple litigation, because its holding contemplates, indeed encourages, two lawsuits by the injured claimant: an initial suit against the insured, followed by a second suit against the insurer for bad faith refusal to settle." 46 Cal.3d at 301, 250 Cal.Rptr. 116, 758 P.2d 58. Second, the Court found that granting a cause of action against the insurer by the injured claimant "may tend to encourage unwarranted settlement demands by claimants, and to coerce inflated settlements by insurers." 46 Cal.3d at 301, 250 Cal.Rptr. 116, 758 P.2d 58. The court quoted extensively from commentators expressing the concern that such inflated settlements would lead to higher insurance coverage costs to the public. Third, the Court identified a serious conflict of interest created for the insurer by the Royal Globe holding: the insurer "must not only protect the interests of its insured, but also must safeguard its own interests from the adverse claims of the third party claimant. This conflict disrupts the settlement process and may disadvantage the insured." Id. at 302, 250 Cal.Rptr. 116, 758 P.2d 58.
In overruling Royal Globe, the Moradi-Shalal Court also relied on the regulatory scheme established by statute for enforcement of the insurer's duty of fair dealing. The Court explained that the Unfair Practices Act itself created an administrative sanction for bad faith and appointed the Insurance Commissioner to enforce the law. In such a setting, the Court implied, no additional private remedy was required. Compare Foley v. Interactive Data Corp., 47 Cal.3d 654, 694-700, 254 Cal.Rptr. 211, 765 P.2d 373 (1988) (discussing and rejecting the need for additional remedy of tortious breach of covenant of good faith and fair dealing in employment contracts).
The question for the court in this case is whether these same factors, relied upon by the court in Moradi-Shalal, apply with equal force to Ehmcke's attempt to sue its surety on a Miller Act bond for breach of the covenant of good faith and fair dealing. First, it appears that such a cause of action might create multiple lawsuits, with the subcontractor first suing in federal court on the bond and then suing in state court for breach of the covenant of good faith. In K-W Industries v. National Sur. Corp., 855 F.2d 640, this is precisely what happened. The subcontractor first sued on the bond under the Miller Act in federal court and then sued in Montana state court for breach of the covenant of fair dealing. The surety removed the second action to federal court on the basis of diversity jurisdiction. Although Ehmcke in this case joins the claims in a single suit, permitting the state law claim potentially opens the door to multiple lawsuits.
Second, the potential for unwarranted settlement demands and inflated settlements may be present in the Miller Act context. Presumably, it is the potential for punitive damages inherent in the bad faith claim which makes the claim alluring. Such a threat could induce litigants to assert *911 unwarranted settlement demands, and ultimately to coerce inflated settlements. This in turn would increase the cost of obtaining surety bonds, and this cost ultimately would be passed on by prime contractors to the United States. Thus, although the cause of action is not preempted by the Miller Act, the California Supreme Court recognized in Moradi-Shalal a policy interest in protecting the public  in this case the United States  against increased insurance costs.
Third, permitting the subcontractor to sue the surety for bad faith would also create an unresolvable conflict of interest for the surety. The surety owes the party who obtained the bond a duty of good faith and fair dealing. See Pacific-Southern Mortgage Trust Company v. Insurance Company of North America, 166 Cal. App.3d 703, 212 Cal.Rptr. 754 (1985). If the surety may also be liable to a third party for bad faith, then it may be forced to compromise the duty to one to fulfill the duty to the other. This potential conflict could interfere with the progress of the primary lawsuit, create uncertainty for the surety, and disadvantage the purchaser of the surety bond.[5]
Finally, as in Moradi-Shalal, there is no compelling reason to extend liability in circumstances involving surety bonds on federal government projects. As with the California insurance law, there is a regulatory scheme in place to sanction bad faith conduct by sureties towards subcontractors. First, the surety is subject to administrative sanctions by federal agencies for failing to properly perform its duties on the bond. 31 C.F.R. § 223.18. United States Treasury Department regulations require surety companies to be certified, to promptly resolve claims, to be licensed in the State where the bond is executed, and to be subject to Treasury Department review if unfavorable reports are received. 31 C.F.R. § 223.5, 223.18; see Alvarez v. Insurance Company of North America, 667 F.Supp. 689, 694-95 (N.D.Cal.1987). The Secretary of the Treasury has authority to revoke or refuse to renew a surety's certificate of authority to engage in government contract bonds when the surety fails to properly perform. 31 C.F.R. § 223.18. Moreover, the surety is subject to further oversight by state insurance regulators in the state where it is licensed. Alvarez, 667 F.Supp. at 695.
Nor is provision for a claim for breach of covenant against the surety necessary to effect the purposes of the Miller Act. Congress sought to achieve those purposes by providing a bond and a remedy on the bond. No other cause of action by the subcontractor against the surety is authorized by federal law. If additional remedies are required to fulfill federal purposes such remedies should be by act of Congress and not by individual state courts.
For all of the above considerations, the court believes that the California Supreme Court, after Moradi-Shalal, would not permit a cause of action by Ehmcke against Wausau for breach of the covenant of fair dealing.
This conclusion finds some further support in California law relating to sureties and in recent California Supreme Court cases restricting the cause of action for tortious breach of the implied covenant of good faith and fair dealing. The California courts have treated the surety relationship as a contract between the surety (Wausau) and the principal on the bond (APR). In several cases, the California courts have stressed that the surety bond represents the full amount of the surety's liability on its contract:
The rules of construction applicable to statutory surety bonds are set forth in Bank of America v. H.M. Dowdy, 186 Cal.App.2d 690 [9 Cal.Rptr. 779 1961], where it is pointed out that a surety on an official bond undertakes no liability for anything which is not within the letter of his contract. The obligation is strictissimi juris; that is, he has consented to be bound only within the express terms of his contract and his liability *912 must be found within that contract or not at all.
Goggin v. Reliance Life Insurance, 200 Cal.App.2d 361, 365-66, 19 Cal.Rptr. 446 (1962). See also United States Leasing Corporation v. duPont, 69 Cal.2d 275, 70 Cal.Rptr. 393, 444 P.2d 65 (1968); Hartford Accident & Indemnity Co. v. Industrial Accident Commission, 216 Cal. 40, 13 P.2d 699 (1932); Lawrence Tractor Co., Inc. v. Carlisle Ins. Co., 202 Cal.App.3d 949, 954, 249 Cal.Rptr. 150 (1988). To permit a cause of action in tort for breach of the covenant of fair dealing by the subcontractor (Ehmcke) not only would expand the surety's exposure beyond the bond but would subject it to suit by one not a party to the surety contract.[6] Yet the California courts repeatedly have stressed that the covenant of good faith and fair dealing arises from a contractual relationship and is limited to the parties in that relationship. See Gruenberg v. Aetna Ins. Co., 9 Cal.3d 566, 108 Cal.Rptr. 480, 510 P.2d 1032 (1973) (covenant of good faith and fair dealing is implied in every contract but since "the non-insurer defendants were not parties to the agreements for insurance; therefore, they are not, as such, subject to an implied duty of good faith and fair dealing"); Coleman v. Gulf Ins. Group, 41 Cal.3d 782, 226 Cal.Rptr. 90, 718 P.2d 77 (1986) ("Nothing in our Royal Globe decision suggests expansion of the common law cause of action for breach of the covenant of good faith and fair dealing to embrace third party claimants").
Moreover, in several recent cases, the California Supreme Court has been notably unwilling to permit a cause of action for tortious breach of the implied covenant of good faith and fair dealing in settings other than traditional insurance contracts. In Seaman's Direct Buying Service, Inc. v. Standard Oil Company of California, 36 Cal.3d 752, 206 Cal.Rptr. 354, 686 P.2d 1158 (1984), the Court struck a note of caution when declining to find such a cause of action in a commercial context:
In holding that a tort action is available for breach of the covenant in an insurance contract, we have emphasized the `special relationship' between insurer and insured, characterized by elements of public interest, adhesion, and fiduciary responsibility.... When we move from such special relationships to consideration of the tort remedy in the context of the ordinary commercial contract, we move into largely uncharted and potentially dangerous waters. Here parties of roughly equal bargaining power are free to shape the contours of their agreement and to include provisions for attorney fees and liquidated damages in the event of breach.
Id. at 769-70, 206 Cal.Rptr. 354, 686 P.2d 1158.
Similarly, in Foley v. Interactive Data Corp., 47 Cal.3d 654, 254 Cal.Rptr. 211, 765 P.2d 373 (1988) the Court held that no tort cause of action for breach of the implied covenant would be permitted in the employment context. The Foley court concluded that a "`special relationship' analogous to that between insurer and insured," id. at 693, 254 Cal.Rptr. 211, 765 P.2d 373, did not exist in employment contracts. The Foley Court noted that tort remedies had been permitted only in the context of insurance contracts, "for a variety of policy reasons," id. at 684, 254 Cal.Rptr. 211, 765 P.2d 373, and that "[t]he insurance cases thus were a major departure from traditional *913 principles of contract law." Id. at 690, 254 Cal.Rptr. 211, 765 P.2d 373.
Following Foley, in a variety of commercial contexts, California Courts of Appeal have refused to find a "special relationship" permitting tort remedies for breach of the implied covenant. See Careau & Company v. Security Pacific Business Credit, Inc., 222 Cal.App.3d 1371, 1399, n. 25, 272 Cal.Rptr. 387 (1990). Although the vitality of the "special relationship" model is unclear after Foley, the Courts of Appeal continue to apply that model and to apply the test of whether a special relationship exists as stated in Wallis v. Superior Court, 160 Cal.App.3d 1109, 1118, 207 Cal.Rptr. 123 (1985): (1) whether the parties are in an unequal bargaining position; (2) whether the motivation for entering into the contract was a nonprofit motivation such as peace of mind; (3) whether ordinary contract damages are inadequate; (4) whether one party is particularly vulnerable and trusting; and (5) whether the other party knows of this vulnerability. See Careau & Company v. Security Pacific Business Credit, Inc., 222 Cal.App.3d at 1399-1400, 272 Cal.Rptr. 387.
In this case Ehmcke contends that a surety relationship should be treated as an "insurance contract" satisfying the test of a special relationship. Yet although suretyship is sometimes treated as a form of insurance, (see General Insurance Company of America v. Mammoth Vista Owners' Association, Inc., 174 Cal.App.3d 810, 823-826, 220 Cal.Rptr. 291 (1988)), courts and commentators recognize that suretyship is different from liability insurance and has a distinct legal history. See id., Hinchey, Surety's Performance Over Protest of Principal: Considerations and Risks, 22 Tort & Ins. L.J. 133 (1986); Hart, Bad Faith Litigation Against Sureties, 24 Tort & Ins. L.J. 18 (1988). Furthermore, there is reason to doubt that Ehmcke's relationship to Wausau or APR for that matter is a "special relationship" in light of the five factors which stress vulnerability and a noncommercial context and motivation. Ehmcke has not shown that any of these factors is present here.
Finally, Ehmcke's reliance on life insurance cases such as Blake v. Aetna Life Ins. Co., 99 Cal.App.3d 901, 918, 160 Cal. Rptr. 528 (1979) and Frazier v. Metropolitan Life Ins. Co., 169 Cal.App.3d 90, 214 Cal.Rptr. 883 (1985), in which beneficiaries are permitted a bad faith claim against the insurer is not persuasive. Those cases simply do not discuss whether the beneficiary should be viewed as a first party or third party claimant. Further, those cases are so factually different from the present case that they are not helpful to this analysis. They involve claims by family members following the death of one of the contracting parties. Here we deal with commercial entities fully prepared to protect their own interests.[7]
In short, the court finds that the California Supreme Court would not permit a cause of action by a subcontractor on a Miller Act project against the surety for breach of the covenant of good faith and fair dealing.

*914 III. May Ehmcke Add Claims For Delay Damages Against APR?

Ehmcke's request for leave to amend its complaint to assert delay damage claims against APR is granted. Prejudice to APR, if any, can be avoided by extending the time for discovery. Few, if any, additional facts beyond those APR would necessarily have discovered already to prove its claim for delay damages against Ehmcke are likely to be relevant. The court, therefore, will critically examine any petition by APR for costs arising from duplicative discovery on this claim.

IV. May Ehmcke Assert a Fraud Claim Against APR?

Ehmcke may also amend its complaint to add a claim for fraud against APR. While the court doubts that this amendment will impose any undue burden upon defendants, to the extent APR may need to duplicate discovery it has already undertaken, in order now to defend the fraud claim, APR may make an application for these costs accompanied by a detailed declaration identifying those costs which were incurred in duplicate and why they were necessary. Only reasonable costs incurred to replicate earlier discovery will be allowed. Again, any prejudice to APR can be alleviated by extending the time for discovery, and the court is prepared to grant APR such additional time as it has requested in its brief in opposition.

V. Scheduling Future Dates.

This order requires the setting of the following new dates:

 Simultaneous disclosure of
 experts March 15, 1991
 Exchange of expert's written
 reports March 29, 1991
 Discovery cut-off May 3, 1991
 Motion cut-off May 3, 1991
 Final Pre-trial Conference July 12, 1991
 Jury Trial September 16, 1991

IT IS SO ORDERED.
NOTES
[1] 40 U.S.C. § 270b provides in pertinent part:

(a) [e]very person who has furnished labor or material in the prosecution of the work provided for in [any contract, exceeding $25,000 in amount, for the construction, alteration, or repair of any building or public work of the United States] ... and who has not been paid in full ... [within ninety days of the last performance], shall have the right to sue on such payment bond for the amount, or the balance thereof, unpaid at the time of the institution of such suit....
(b) Every suit instituted under this section shall be brought in the name of the United States for the use of the person suing, in the United States District Court for any district in which the contract was to be performed and executed....
[2] In surety law, the insurer such as Wausau is referred to as the "obligor"; the entity protected by the bond, in this case Ehmcke, is referred to as the "obligee"; the entity purchasing the bond, here APR, is referred to as the "principal". See e.g. Hinchey, Surety's Performance Over Protest of Principal: Considerations and Risks, 22 Tort Ins. L.J. 133 (1986).
[3] See, e.g., Halterman v. U.S.F. & G. Co., 219 Cal.App.3d 1495, 269 Cal.Rptr. 363 (1990) (finding no cause of action for breach of the covenant of good faith and fair dealing by a subcontractor against the prime's surety. Ordered depublished by the California Supreme Court). The court in General Insurance Company of America v. Mammoth Vista Owner's Assoc., 174 Cal.App.3d 810, 220 Cal.Rptr. 291 (1985) based its holding solely upon an implied private cause of action found in Cal.Ins.Code 790.03, a holding which was subsequently overruled in Moradi, 46 Cal.3d 287, 250 Cal.Rptr. 116, 758 P.2d 58.
[4] In Amfac Mortgage Corp., 583 F.2d 426, 434-35 (9th Cir.1978), the Ninth Circuit held that Arizona law would not permit a tort action against a surety by the obligee on the bond:

It would seem that the Arizona courts would follow the general rule that the liability of the surety is limited to the express terms of the surety contract.... There do not appear to be any cases, from any jurisdiction, where a court has implied a cause of action giving an obligee a claim in tort when a surety has allegedly breached an obligation of good faith. Even California law, which Amfac finds so persuasive, holds that a surety cannot be held beyond the express terms of the contract.
Some years later, however, the Arizona Supreme Court found that Arizona common law did permit an action by the obligee against the surety for breach of the covenant of good faith. See Dodge v. Fidelity and Deposit Company of Maryland, 161 Ariz. 344, 778 P.2d 1240 (1989). In addition, at least one other state supreme court has also permitted such an action based on state common law. See Suver v. Personal Service Ins. Co., 11 Ohio St.3d 6, 462 N.E.2d 415 (1984). In K-W Industries, 855 F.2d 640 (1988), the Montana Supreme Court permitted such an action on the basis of state statutory law.
[5] One commentator notes that this conflict of interest simply is inherent in the suretyship tripartite relationship. Hart, Bad Faith Litigation against Sureties, 24 Tort & Ins. L.J. 18 (1988).
[6] In General Insurance Company of America v. Mammoth Vista Owners' Assoc., 174 Cal.App.3d 810, 826, 220 Cal.Rptr. 291 (1985), the court found no conflict between the principle that "the surety's obligation to cover losses occasioned by the breach of the principal is limited to those losses it expressly agreed to guarantee" and imposition of liability in tort "for its independent violation of statutory or common law duties in the handling of a claim under the bond." Moreover, at least two California courts have permitted the principal to sue the surety for breach of the covenant of good faith and fair dealing thus exposing the surety to liability beyond the bond. See Pacific-Southern Mortgage Trust Co. v. Ins. Co. of North America, 166 Cal.App.3d 703, 212 Cal.Rptr. 754 (1985); Downey Savings & Loan Ass'n. v. Ohio Casualty Ins. Co., 189 Cal.App.3d 1072, 234 Cal.Rptr. 835 (1987). Nonetheless, permitting suits by the obligee for sums beyond the amount of the bond would considerably weaken the principle that a surety is not liable beyond the bond. See Amfac, 583 F.2d at 435.
[7] Courts in other states which have permitted an injured third party to sue an insurer or surety in tort for breach of the covenant of good faith and fair dealing have adhered to the distinction between commercial and non-commercial entities. For example, in Dodge v. Fidelity and Deposit Company of Maryland, 161 Ariz. 344, 778 P.2d 1240, the Arizona Supreme Court permitted plaintiff-homeowner to sue its contractor's surety for bad faith, since the plaintiff had "contracted for security and protection rather than profit or commercial advantage" and permitting tort damages would create a substantial deterrent against breach for the party receiving commercial advantage. Id. at 346, 778 P.2d at 1242. Similarly, in Suver v. Personal Service Insurance Company, 11 Ohio St.3d 6, 462 N.E.2d 415 (1984), the Ohio Supreme Court held that sureties could violate a tort duty of good faith in processing the claims of a person injured by the surety's principal in a traffic accident. The court analogized the surety's responsibility under the bond to an automobile liability insurer's and compared the public policy supporting each decision. The public policy considerations supporting an insurer's liability to its insurer included the great disparity of financial resources of the insurer and insured, the fact that the insurer is "affected with a public interest" and the concern that denying the insured a bad faith claim would "encourage the routine denial of payment of claims for as long as possible." 462 N.E.2d at 417. The court held that these factors supported liability of a surety as well. Id.