**340**

778 P.2d 1236

**David Elgin DODGE and Anneliese M.**
**Dodge, husband and wife,**
**Plaintiffs–Appellants,**

**v.**

**FIDELITY AND DEPOSIT COMPANY**
**OF MARYLAND, Defendant–Appellee.**

**No. 1 CA–CIV 7675.**

Court of Appeals of Arizona,
Division 1, Department D.

May 1, 1986.

Review Granted Sept. 16, 1986.

Jennings, Strouss & Salmon by Stephen
A. Myers, Jefferson L. Lankford, Phoenix,
for plaintiffs-appellants.

Snell & Wilmer by H. William Fox and
Richard L. Strohm, Phoenix, for defendant-
appellee.

## OPINION

JACOBSON, Presiding Judge.

The sole issue raised by this appeal is whether a surety under a construction performance bond may be liable in tort for the breach of an implied covenant of good faith as to the obligee under the bond.

Since this matter was disposed of in the trial court by the granting of a motion to dismiss for failure to state a claim for relief, we deem the facts on appeal to be undisputed.

In March 1978, plaintiffs-appellants, Mr. and Mrs. Dodge (the Dodges), entered into a construction contract with Homes & Son Construction Co. (Homes) for the construction of a residence in Scottsdale, Arizona. This contract required Homes to obtain a performance bond in the face amount of the contract ($205,903.00). Fidelity & Deposit Co. of Maryland (Fidelity) became the surety on the bond for its principal, Homes. The performance bond provided:

Whenever Contractor shall be, and declared by Owner [Dodge] to be in default under the Contract, the Owner having performed Owner's obligations thereunder, the Surety may promptly remedy the default, or shall promptly

(1) Complete the Contract in accordance with its terms and conditions, or

(2) Obtain a bid or bids for completing the Contract....

Homes failed and refused to supply labor and other materials to the project including correction of defective workmanship and materials in accordance with the contract. The Dodges declared Homes in default and made demand upon Fidelity to remedy the default. Fidelity refused to make a timely investigation of the Dodges' claim or to remedy the default either themselves or through another contractor.

The Dodges filed suit against Homes and Fidelity and the breach of contract claim against Homes was submitted to arbitration. The arbitrators returned an award in

favor of the Dodges in the sum of $9,714.00. This amount was paid by Homes into court. Fidelity then moved to dismiss the Dodges' claim against it for tortious bad faith, which was granted.

Thereafter, the Dodges and Homes stipulated that the amount deposited in court be paid to the Dodges in full satisfaction of their claim against Homes and dismissal of this claim with prejudice.

The Dodges have appealed contending that Fidelity is liable for extracontractual damages (mental anguish and punitive damages) upon a tort theory of breach of an implied covenant of good faith.

There is no doubt that in Arizona an "insurer" owes a duty of good faith to its "insured" and a breach of that duty gives rise to liability for tort damages caused thereby. *Noble v. National Am. Life Ins. Co.*, 128 Ariz. 188, 624 P.2d 866 (1981); *Sparks v. Republic National Life Ins. Co.*, 132 Ariz. 529, 647 P.2d 1127, *cert. denied*, 459 U.S. 1070, 103 S.Ct. 490, 74 L.Ed.2d 632 (1982).

The Dodges argue that since a surety is considered an "insurer" under the Arizona statutes, *see* A.R.S. §§ 20–103, –104 and –257, a surety should also be considered an "insurer" for the purposes of exposing it to liability for the tort of bad faith. In our opinion this approach is too simplistic. Rather, the issue requires an analysis of the surety relationship and a determination of whether the relationship between a surety and an obligee equates to that "special relationship" recognized in *Noble* which justifies the creation of a cause of action in tort for bad faith breach of a contract.

Before analyzing this policy decision and the relationship created by a suretyship, we turn to the cases cited by the Dodges. These may be divided into two categories: (1) cases from those states which have enacted a "vexatious" refusal to pay a claim statute, *see Housing Authority of City of Clinton v. Baumann*, 512 S.W.2d 436 (Mo. App.1974); *United States v. F.D. Rich Co., Inc.*, 439 F.2d 895 (8th Cir.1971); *Fisher v. Fidelity & Deposit Co. of Maryland*, 125 Ill.App.3d 632, 80 Ill.Dec. 880, 466 N.E.2d 332 (1984); and (2) cases in which the duty

of good faith is recognized as existing in the surety relationship. *See New Amsterdam Casualty Co. v. Lundquist*, 293 Minn. 274, 198 N.W.2d 543 (1972); *Matter of Guardianship of Davison*, 31 Wash.App. 480, 642 P.2d 1259 (1982).

In the "vexatious" statute cases, however, damages for the bad faith refusal to pay a claim are not conventional tort damages. For example, in Missouri they are limited to the amount of loss under the policy, plus collection of attorney's fees and damages not to exceed 20% of the first $1,500.00 of the loss and 10% of the amount of loss in excess of $1,500.00 Mo.Rev.Stat. § 375.420 (1978). In Illinois, such damages are limited to attorney's fees as part of the taxable costs in the action, plus an amount not to exceed $5,000.00. Ill.Rev.Stat. Ch. 73, paragraph 767 (Supp.1985). Thus, none of these cases stand for the proposition that tort damages, that is, pain, suffering, mental anguish, or punitive damages, are collectible against a surety even though it may be guilty of a bad faith refusal to pay claims.

In the *New Amsterdam* case, the court recognized that a surety which is seeking reimbursement from its principal for sums paid to a creditor may be limited to the amount it could have settled with the creditor, where the offer of settlement was not conveyed to the principal. In the *Guardianship of Davison* case, the court intimated that a surety who failed to act in good faith may be liable for attorney's fees for breach of contract damages. Again, none of these cases recognize the imposition of tort damages on the surety.

The court has discovered one case from the California Court of Appeals, *General Insurance Co. of Am. v. Mammoth Vista Owners Ass'n*, 174 Cal.App.3d 810, 220 Cal. Rptr. 291 (1985), which has recognized the tort of bad faith as against a surety. In *Mammoth Vista*, a California statute required that if the common areas of a condominium were not completed prior to being offered for sale, then the subdivider must arrange for a completion bond to assure completion of the improvements lien free.

In addition, provisions of the California Insurance Code provided that an insurer was in violation of the code if it failed to act promptly in connection with claims, failed to attempt in good faith to settle claims, compelled the insured to institute litigation unnecessarily and delayed the investigation of a payment of claims.

The *Mammoth Vista* court found that a surety was bound by these provisions of the Insurance Code. In addition, the court found:

> When subdividers represent that a development will contain common area facilities, section 11018.5 requires that the completion of any common area facilities not completed prior to issuance of the final report be assured by one of several optional means, including a completion bond. *The bond in this case serves an important public purpose by protecting the expectations of buyers and lessees of subdivided property.* (Emphasis added).

*Id.* at 825, 220 Cal.Rptr. at 299.

Based upon these stated statutory public policy considerations the court held the surety in that case to be liable for tort damages for breach of its duty to act in good faith toward the obligees under the statutory bond. Obviously, these statutory public policy considerations are not present in the private commercial transaction involved here.

One further case deserves discussion, *Continental Realty Corp. v. Andrew J. Crevolin Co.*, 380 F.Supp. 246 (S.D.West Vir.1974). The Dodges cite this case for the proposition that "[s]ureties for hire are not wards of court to be shielded from heedlessness or folly. They must abide by their contracts and pay everything which by fair intendment can be charged against them." *Id.* at 253, *quoting from C.S. Luck & Sons, Inc. v. Boatwright*, 157 Va. 490, 162 S.E. 53 (1932). However, *Continental Realty* used this language in the context of contractual damages, that is, a surety, based upon its own breach of its performance bond obligations (as compared to its principal's breach) may be liable for all contractual damages flowing from that breach, even though the amount exceeds the penal sum of its bond.

Here, the Dodges have received all the contractual damages to which they are entitled. They seek, not contractual damages, but tort damages for mental anguish and punitive damages.

Having analyzed the case law in the area, an analysis of the relations created by a suretyship is in order. In the casualty insurance situation the implied covenant of good faith and fair dealing, as noted in *Noble, supra,* quoting from *Gruenberg v. Aetna Ins. Co.*, 9 Cal.3d 566, 510 P.2d 1032, 108 Cal.Rptr. 480 (1973), "is imminent in the [insurance] contract whether the company is attending to the claims of third persons against the insured or the claims of the insured itself." 128 Ariz. at 189, 624 P.2d at 867. Thus, in the one-on-one relationship existing where casualty (liability) insurance is involved the duty of good faith can never be in conflict from the standpoint of either party.

This duty of undivided loyalty is not present in a surety relationship:

> ... when the courts are dealing with the rights, remedies, and defenses of a surety, the rules of insurance furnish no help. A contract of surety creates a tripartite relation between the party secured, the principal obligor, and the party secondarily liable, and the rights, remedies, and defenses of a surety cannot be disassociated from this relationship even though you call the contract one of insurance.

*Meyer v. Building & Realty Service Co., Inc.*, 209 Ind. 125, 196 N.E. 250, 253 (1935).

This tripartite relationship is recognized in the Restatement of Security and especially Division II thereof, entitled "Suretyship." *Restatement of Security*, §§ 82 *et seq.* (1941). The relationship, using the terminology of the *Restatement*, among the surety (Fidelity), the principal (Homes) and the creditor (Dodge) is the subject matter of some 61 separate sections of the *Restatement* which outlines the various legal relationships that exist between these three parties. Without exhausting the subject, suffice it to note that a creditor, by its actions, may relieve a surety of liability

even after default by the principal. *See Restatement of Security,* §§ 122–125 *et seq.* Likewise, the surety may lose its right to reimbursement from the principal if the surety knowingly prejudices any defenses the principal may have against the creditor. *See Restatement of Security* § 108. In short, even if we concede that the surety has a good faith obligation to the creditor, there is an equally enforceable obligation of good faith existing between the surety and the principal. *Cushman v. National Surety Corp. of New York,* 4 Ariz.App. 24, 417 P.2d 537 (1966).

Thus, the question is not whether a duty of good faith exists, a breach of which will result in liability, but rather, where the loyalty of good faith is divided must that liability for breach be measured by contract or tort damages.

We now turn to the policy determination of whether there exists in this tripartite surety relationship that "special relationship" recognized in *Noble,* which would justify the imposition of tort damages for a breach of contract. Among the factors articulated in *Noble* are: (1) that casualty insurance is obtained as protection against calamity, not for commercial advantage; (2) there is usually an unequal bargaining position between the insured and the insurance company; (3) often the insured is in an especially vulnerable economic position when the casualty loss occurs; and (4) the "whole purpose of insurance is defeated if an insurance company can refuse or fail, without justification, to pay a valid claim." 128 Ariz. at 190, 624 P.2d at 868.

The most obvious difference between a surety under a construction performance bond and a casualty insurer is the nature of the risk insured against and the consequences to the insured following a wrongful refusal of the insurer to perform. We need only compare the consequences in *Sparks, supra,* of the insurer failing to provide medical benefits resulting in the insured suffering a two-inch shortening of the leg, a curved spine and a lifetime of continued medical treatment with the leaking roof suffered by the Dodges in this case, to quantify that difference. More-

over, the performance bond obligation is, unlike the casualty insurer's obligation, entered into in a commercial setting—a contract to build a residence.

The *Noble* court also pointed to the unequal bargaining positions of the parties in the casualty insurance setting. In the surety situation, the surety never even sees the creditor, let alone bargains with him. Its obligations, if undertaken, are set by the contract entered into between the Dodges and Homes. In that transaction we assume the Dodges could have required Homes to provide any type of performance bond they desired. In any event, there is no contention that the bargaining position of the Dodges and Homes is unequal.

The final factor noted in *Noble* is that the whole purpose of insurance (i.e. the protection against calamity) is defeated if the insurer fails to pay. Here, it can hardly be asserted that the construction industry lives or dies because a surety fails to perform under its bond. In fact, a large amount of both residential and commercial construction occurs without a surety ever being involved. It is only in the rare occurrence where the contractor becomes financially unable to perform that the surety is called upon. Here, Homes fully satisfied the contested issue as to the leaking roof.

In short, given the difference in the relationship created by casualty insurance and surety insurance, we see no compelling public policy reasons to expand the damages collectible against a surety beyond those traditionally provided for breach of contract. This is especially true if the surety can be subject to contractual damages beyond the penal sum of its bond, for the breach of its own contract.

The judgment of the trial court is affirmed.

MEYERSON and SHELLEY, JJ., concur.